[L. A. No. 724.    In Bank.—January 3, 1901.]

T. J. HIGGINS et al., Plaintiffs, v. CITY OF SAN DIEGO et al., Respondents.    SAN DIEGO WATER COMPANY, Appellant.

MUNICIPAL CORPORATION—EXCESS OF INDEBTEDNESS OVER REVENUE—CONSTRUCTION OF CONSTITUTION.—The inhibition of the constitution against the incurring of indebtedness or liability by a city "exceeding in any year the income and revenue provided for it for that year," is to be naturally and reasonably construed as providing that all legitimate indebtedness of the municipality must not exceed all the revenues and income provided for that year.

ID.—RIGHTS OF CREDITORS—CONTRACTS IN RELATION TO REVENUE—SPECIAL FUNDS.—The creditors of a city have the right to contract with reference to its entire revenue, except in so far as the charter expressly otherwise provides in the case of special funds, such as the school or library fund.

ID.—TRANSFERABLE SURPLUS IN SPECIAL FUNDS—VALIDITY OF INDEBTEDNESS.—In determining the validity of a particular indebtedness incurred in any year, not only is the condition of the general fund and of any particular fund out of which such indebtedness is primarily payable to be considered, but also all surplus moneys remaining at the end of the fiscal year in other special funds, not primarily applicable thereto, which might lawfully be transferred to an applicable fund, after meeting all claims specially chargeable to such funds, must be taken into consideration.

ID.—PERCENTAGE OF TAX LEVY NAMED FOR EACH FUND—APPORTIONMENT—TRANSFER OF SURPLUS NOT PROHIBITED.—A provision in a city charter that "the percentage of each annual tax levy shall be named for each fund and the whole amount of taxes and revenue of the city apportioned to said several funds accordingly," is not equivalent to the declaration of a purpose to limit any particular class of expenditure to the apportionment made for that class, and to prohibit the transfer of a surplus from one fund to reinforce another exhausted fund.

ID.—EXHAUSTED FUND—REFUSAL TO TRANSFER—CLAIM NOT DEFEATED.—A city cannot defeat a claim primarily payable out of an exhausted fund by refusal to transfer the surplus from another fund thereto, the transfer of which is not prohibited by its charter.

ID.—SUBSEQUENT LOSS OF DEPOSITOR'S FUNDS—FAILURE OF BANK—LIABILITIES NOT AFFECTED.—Moneys provided by the city for the revenue of a current year become part of its funds against which liabilities may accrue, and the validity of those liabilities cannot be affected by any subsequent loss caused by a deposit made

in a bank, owing to the failure thereof and a final partial collection of the money.

ID.—ORDER OF PAYMENT OF CLAIMS—TIME OF ACCOUNT—PRESENTATION.—In the absence of a provision in a city charter making the city liable in the order in which claims accrue against it, there is no priority of right among the claimants, except in the order of their presentation for immediate payment.

ID.—CONSTRUCTION OF CHARTER—CITY BECOMING "OWNER" OF WATER SUPPLY—WATER FUND—PREFERRED PAYMENTS.—Under a city charter providing that when the city becomes "the owner of any water supply" it shall establish a water fund, and make the salaries of the commissioners and the operating expenses of the water plant payable before the monthly rental, the word "owner" is to be construed, not in the sense of title, but in the sense of having control of a water supply.

ID.—VOID LEASE—CONTROL OF PLANT—LEGALITY OF FUND AND PAYMENTS—CLAIM FOR WATER USED.—The fact that the city held a void lease of a water plant, over which it exercised control, does not make the creation of a water fund and the making of preferred payments therefrom illegal or void as against a claim of the water company for the reasonable value of water used by the city.

ID.—PAYMENT OF SALARY OUT OF GENERAL FUND.—The payment of the legal salary of a city justice out of the general fund, instead of out of the salary fund, is not an illegal payment which can be complained of by a water company in an action for the reasonable value of water used by the city.

ID.—SPECIAL FUNDS NOT PRIMARILY LIABLE.—Neither the "street fund" nor the "street sprinkling fund" can be held primarily liable to the payment of a claim for the reasonable value of water used by the city, where there is no evidence that any of the water supplied by the plaintiff was used upon the streets, and the charter does not make those funds primarily liable for plaintiff's claim.

APPEAL from a judgment of the Superior Court of San Diego County and from an order denying a new trial. E. S. Torrance, Judge.

The facts are stated in the opinion.

Works & Works, for Appellant.

H. E. Doolittle, City Attorney, for City of San Diego, Respondent.

Luce & McDonald, for San Diego Flume Company, Respondent.

Haines & Ward, for Plaintiffs.

CHIPMAN, C.—Plaintiffs brought this action, as taxpayers of the city of San Diego, to set aside a contract of lease between the said city and defendant water company. The case was tried on the cross-complaint of the water company and the answer of the defendant city thereto, the plaintiffs having withdrawn from the action. The court found that the lease in question was void, and that the company was not entitled to recover the reasonable value of the use of its property by the city, nor was it entitled to damages for that breach of the contract. On appeal, the decision of the lower court was affirmed as to the invalidity of the contract of lease, but the court held that the company was entitled to recover the reasonable value of the use of its plant and water. (*Higgins v. San Diego*, 118 Cal. 524, 528.) On rehearing, as to the form of judgment the court held that the company was entitled to an "ordinary general judgment for whatever amount shall be found due it, without any direction as to the revenues out of which the judgment shall be satisfied." The directions given to guide the trial court will be better understood from the following excerpt from the court opinion on the rehearing: "We cannot direct the superior court to enter a judgment upon the findings for the reasonable value to the city of the use of the water company's plant and of the water supplied, because it does not appear that the claims of the water company all accrued at a time when there were unappropriated revenues to meet them, and it will be necessary for the court to ascertain, as the basis of its judgment against the city, just when the claims of the water company for the reasonable value of use aforesaid, etc., equaled the amount of unappropriated revenues for the respective fiscal year during which the city had the use of the water company's plant. Claims for the use of plant and the value of water supplied after such time are like other claims upon exhausted revenues; they are void, and will not warrant a judgment of any character."

At the first trial the lower court found the reasonable value of the use of the plant and water per month, and at the second trial evidence was given of the payments made from time to time on account and the money in the treasury to the credit of the various funds at the end of each month, and also show-

ing the amounts accruing and unpaid each month during the
time the plant was held by the city.   The period of use was
from June 1, 1891, to March 7, 1893.   In ascertaining the un-
appropriated revenues to meet the water company's claims, the
trial court found that there were but two funds provided by
the city which were applicable to their payment, to wit, the
"water fund" and the "general fund"; that there was no money
in either of these funds, when the unpaid claims of the com-
pany accrued, available for their payment for the year 1891;
that there was to the credit of these two funds for the year
1892, available for the payment of the company's claims for
that year, only the sum of $5,421.29; that for the year 1893
there was available, in addition to payments made, the further
sum of $5,997.22 to the credit of said two funds.   This sum
was sufficient to pay in full the balance due for 1893.   Upon
these findings the court gave judgment against the city for
the sum of $11,418.51, leaving quite a large sum unprovided
for.   From this judgment the water company appeals.

The constitutional provision involved is section 18, article
XI: "No county, city, . . . . shall incur any indebtedness or
liability in any manner, or for any purpose, exceeding in any
year the income and revenue provided for it for such year with-
out the assent of two-thirds of the qualified electors," etc.

Appellant's contention is, that all contracts or liabilities in-
curred by the city during any fiscal year are valid and binding
up to the amount of the revenues of the year, and that it is
only contracts made or liabilities incurred after that time or
beyond the revenue for the year that are void.   Applied practi-
cally, the contention is: 1. That there were certain funds pri-
marily applicable to the payment of the company's claims, to
wit, the general fund, the street fund, the street sprinkling
fund, and the water fund; and 2. That of all other funds,
except possibly the school fund, all surplus remaining on hand
at the end of the fiscal year in each fund, after paying the
liabilities chargeable against that fund, must be applied to the
payment of the general liabilities of the city for that fiscal
year before being carried forward to the next year.   This is
the principal question presented by the appeal, and we give
appellant's statement of its position still further as follows:

Conceding that moneys apportioned to any fund cannot be used for any other purpose until the object for which it has been apportioned has been accomplished, the learned counsel say: "But what we insist upon is, that when the object for which it has been apportioned has been accomplished by meeting all the claims specially chargeable to that fund, the surplus is applicable to the payment of other debts or liabilities of that year, and cannot be carried over into another year leaving debts of the present year unpaid."

If the municipal revenues were all thrown into a general fund out of which all claims could be paid to the limit of such revenues, the solution would be much simplified. But this is not the case. Under the charter of the city there are certain designated funds, and the charter requires the revenues raised by taxation and from other sources, such as licenses, fines, etc., to be apportioned to these various funds.

In a series of cases, commencing with *San Francisco Gas Co. v. Brickwedel*, 62 Cal. 64, this court has decided that no indebtedness shall be incurred (except in the manner stated in the constitution) exceeding in any one year the revenue actually received by the municipality; i. e., that each year's income must pay each year's liability, no part of which shall be paid out of the income of any future year. Other cases dealing with this provision of the constitution are *Shaw v. Statler*, 74 Cal. 258; *Schwartz v. Wilson*, 75 Cal. 502; *Smith v. Broderick*, 107 Cal. 644[1]; *Weaver v. San Francisco*, 111 Cal. 319; *McBean v. City of Fresno*, 112 Cal. 159[2]; *Bradford v. San Francisco*, 112 Cal. 537; *Higgins v. San Diego, supra*. The precise question now before us as applicable to municipal expenditures, has not, we believe, been decided.

Looking to the language of the constitution we find the only inhibition to be that "no . . . . city . . . . shall incur any indebtedness or liability . . . . exceeding in any year the income and revenue provided for it for such year," etc. The natural and reasonable construction to be given this language is that all legitimate indebtedness of the municipality for any year must not exceed all the revenues and income provided for that year, and all indebtedness beyond such provision becomes

[1] 48 Am. St. Rep. 167.        [2] 53 Am. St. Rep 191.

void and cannot be paid out of the funds of a succeeding year or at all except by the assent of two-thirds of the qualified voters. In the case before us, there were moneys of considerable amount at the close of one or more years, when the company's claims accrued and were presented, against which there were no other claims made. These moneys had been distributed to various "funds" created by the charter, or by the council pursuant to the charter, but because the company's claims were not on their face payable out of any one of these "funds" payment was refused, and these surplus moneys were carried over into the next year and paid out as moneys belonging to the particular "funds" on claims accruing against those "funds" during the succeeding year. In our opinion, there is nothing in the constitution forbidding the payment of the company's claims at the end of the year out of any revenue on hand in the various "funds" against which no claims existed, which had accrued that year. If there is anywhere any inhibition against payment, it must be found in the municipal charter or in some legislative provision elsewhere to be found. We know of no legislation applicable to the case outside of the municipal charters act. (Act of March 16, 1889; Stats. 1889, p. 643.) Sections 11 and 12 (Stats. 1889, p. 658) and section 12 (Stats. 1889, p. 709) are substantially re-enactments of the constitutional provision, and there is nothing in these sections that goes further than to provide that no liability shall be incurred "during any fiscal year that cannot be paid out of the revenues provided for such fiscal year." This fiscal year begins January 1st, "for taxation, assessment, and all other purposes." (Stats. 1889, p. 698.) If any provision is to be found in the act reaching the question now here, it is found in the section establishing so-called "funds" (Stats. 1889, p. 707), or other sections a summary of which will next be given. Section 9 reads: "The following funds are hereby established: 1. 'Fire department fund,' upon which all warrants must be drawn for fire department supplies and expenses whatsoever." Then follow thirteen other funds with like directions that all claims pertaining to the particular fund must be paid by warrants drawn on that fund. The section contains a general provision as follows: "The common council may, from time to time, establish such

other funds as they may deem necessary, and shall establish and continue in force all interest funds, bond funds, bond redemption funds, and other funds now or hereafter established for the payment of all interest upon and the payment of all bonded indebtedness of the city; and the percentage of each annual tax levy shall be named for each fund, and the whole amount of taxes and revenue of the city apportioned to said several funds accordingly; and no transfer shall be made from one fund to another except as otherwise provided in this charter, unless by a vote of the common council, by ayes and noes, recorded in the journal of proceedings; and in no case shall any moneys be transferred from the school fund or library fund to any other fund. The common council shall by ordinance determine and designate to what funds shall be apportioned all moneys arising from the levy of all license taxes in the city; provided, that none of such moneys shall be apportioned to either the school fund, library fund or to any of the bond funds, interest funds or bond redemption funds of the city." Section 10 (Stats. 1889, p. 708) requires all fines to be apportioned to funds as follows: "One-half thereof to the police department fund and the other half into the street fund." Section 11 (Stats. 1889, p. 708) requires all officers who collect moneys belonging to the city, except moneys collected by the treasurer on account of redemption of property sold for taxes, to make monthly statements to the auditor and pay such moneys to the treasurer. The auditor must, upon filing the treasurer's receipt, "forthwith apportion the money so paid in to the several funds to which it belongs, and file with the treasurer his statement of such apportionment." There is nowhere any provision that when money is once apportioned to a given fund it shall be thenceforth dedicated to the payment only of warrants authorized to be drawn upon that fund; the nearest approach to such provision is the following: "In no case shall any moneys be transferred from the school fund or library fund to any other fund." Section 5 (Stats. 1889, p. 705) relating to the duties of the auditor requires that he "shall apportion all moneys paid into the treasury of the city, in accordance with the annual tax levy and ordinances imposing and apportioning license taxes, fines, etc., and draw all warrants up-

on the treasury for salaries as fixed by the charter, and for all demands and bills allowed and ordered paid by the auditing committee." He must keep a cash-book, which shall show at all times the amount of moneys received in the treasury, by whom paid in, and on what account, and show all moneys paid out, giving the number and date of warrant paid, and show the balance in the treasury. He shall keep in ledger form a just and correct account with the various funds of the city, and shall, monthly, make report to the council an abstract of his accounts with said funds for the preceding month, showing receipts and disbursements and from what received and for what paid out, and the balances in each fund and the amount received in and paid out of the treasury during said month. Sections 1 and 2 (Stats. 1889, p. 704) prescribe the duties of the auditing committee in the allowance of claims and the ordering of warrants in payment, and they must "designate the particular funds from which they are to be paid," etc. Bearing upon the question in some measure are the provisions found in sections 1 and 2 (Stats. 1889, p. 696) as to levying the annual tax. The auditor, on or before the first Monday of April in each year, "shall prepare and transmit to the common council, accompanied with the estimates and reports of each department, . . . . an estimate of the probable necessities for the city for the current fiscal year, giving the amount required to meet the . . . . probable wants of all the departments . . . . in detail, and showing the necessities of each of the several funds to be provided for in the treasury." The charter directs that this estimate shall, as near as may be, show the revenue anticipated and the probable expenditures based on the expenditures and resources of the preceding year. With this estimate before them, the council are required to fix the tax rate and make the levy "necessary to raise sufficient revenues to carry on the different departments of the municipal government for the current fiscal year."

The "water fund" was established by ordinance No. 128, by which the lease of the water company's plant was accepted pursuant to the lease executed April 18, 1891, under the authority of joint resolution No. 56; the ordinance created a water department, a board of water commissioners, and prescribed their

duties and fixed their compensation. Section 9 of the ordinance provides as follows: "That in conformity with the provisions of the city charter a water fund is hereby established, into which all revenues derived from the department shall be paid, and upon which all warrants shall be drawn for salaries, material, supplies, and expenses of every description connected with the water department, including the monthly payment of rent as stipulated by said lease, which warrants shall be drawn and paid in the order above mentioned." The ordinance authorized the board of water commissioners to "set all water rates for takers and consumers in accordance with such ordinances as are now in force or which may hereafter be adopted," etc., and it provided that "all money received by said board shall be paid to the city treasurer, who shall keep duplicate receipts therefor, one of which shall be filed with the city auditor, who shall keep accurate accounts of all receipts and disbursements." There was no source of revenue specially designated upon which warrants were authorized to be drawn for the support of this department or to pay the lease rentals except this water fund; the general fund was available, if at all, by reason of its being created to pay "the appropriations and general expenses not payable from other funds." Apparently, the strongest expression in the charter as above synopsized, tending to support the view taken by the trial court is the following: "And the percentage of each annual tax levy shall be named for each fund, and the whole amount of taxes and revenue of the city apportioned to said several funds accordingly." But this is not equivalent to the declaration of a purpose to limit any particular class of expenditures to the apportionment made for that class, for if that were so there could be no transfer from one fund to another to reinforce an exhausted fund. In *Potter v. Fowzer*, 78 Cal. 493, it was held that where the law established a fund and expressly limited the amount of its receipts, the board of supervisors could not transfer money from the general fund and thus increase the expenditures under this limited fund. If we could find in the charter of defendant any express limitation upon the expenditures under a particular fund, we would still have to find some provision which in its effect prohibited the use of any surplus there might remain in

that fund at the end of the year for any other purpose, before
we could say that this surplus could not be used for some other
object.  It is not denied by either party that this surplus might
be transferred to some other fund, even though that other fund
had been exhausted of all the money apportioned to it.  But
this could not be done if the money apportioned to each fund
must be regarded as dedicated to the use of that fund alone.
The object of the law in providing for transfer from one fund
to another is to meet a case where in the original apportion-
ment the council had miscalculated as to the probable require-
ments of the various funds.  The power to create other than
the funds designated in the charter shows that it was in the
mind of its framers that some portion of the revenue provided
for the fiscal year might be required for purposes not embraced
in funds existing when the apportionment for the year might
be made.  The form of demands, bills and claims against the
city prescribed by section 3 (Stats. 1889, p. 705) requires no
mention by the claimant of any fund to which he must look,
and when he receives his warrant, drawn as it must be upon
some designated fund, he enters into no agreement to look
alone to that fund.  (*Carter v. Tilghman,* 119 Cal. 104.)  If
the fund is at the time of presentation exhausted, the claim
cannot be paid, but the council may transfer money from some
other fund and thus pay it, for it is not an illegal claim because
when first presented there were not moneys to meet it.  Where
a legitimate indebtedness has been incurred for one of the var-
ious objects for which the municipality was created, and a claim
therefor is duly presented, we do not think it is within the
power of the municipality to defeat payment by drawing a
warrant on some exhausted fund, or by refusing to draw a
warrant because the particular fund applicable to its payment
is exhausted.  (*Carter v. Tilghman, supra.*)  If at the close of
the fiscal year there is a surplus in any fund, not expressly
reserved by some law for the payment of claims upon that par-
ticular fund, and there are no claims existing against that fund
created during the year, such surplus, and any other surplus re-
maining in any other such fund, should be and is available to
discharge the unpaid legitimate indebtedness of that fiscal year;
and we find nothing in the law to forbid this just and proper

course to be taken. Let us not be misunderstood. There may be a surplus—for example, in the "salary fund"—at the end of the year, because some salaries have not yet been actually paid; there may be claims presented and allowed at the close of the year, for which warrants have not yet been drawn, upon other funds. In such case the surplus would be the moneys in the treasury against which there was no just claim presented or existing under the law, as in the case of salaries; and this surplus, in our judgment, should be treated as money applicable to the payment of any just debt then existing created during that year. And a claimant cannot be deprived of his right to this surplus simply because the particular fund against which his warrant is drawn or should be drawn has become exhausted. (See *Stevens v. Truman,* 127 Cal. 155.) The city cannot defeat the payment of its honest debts by refusing to transfer funds to an exhausted fund; or by accumulating an undue proportion of the year's revenue in any one fund; or by transferring from one fund to another fund in order to defeat the claim against the fund from which the transfer was made. As was said in *Carter v. Tilghman, supra,* the council has "no power to indulge in a game of hide and seek with the funds" of the city. We do not wish to intimate that the council in the present case purposely arranged the funds at the close of the year so as to leave nothing in the "water fund" or "general fund." But it must be obvious that by a simple bookkeeping process the council could so manipulate the funds of the city as to work great injustice if they could carry over into another year the surplus of moneys in the various funds simply because there were no claims against the city which were primarily payable from such funds. We think the creditors of the city have the right to contract with reference to its entire revenue, and while it may be that payment cannot be enforced so long as the particular fund primarily available is without moneys to make payment, still if at the end of the year there is a surplus in any other fund not claimed or not by the charter expressly reserved, it should be used to pay the debts of the city so far as the surplus will go. This seems to be all that was designed to be accomplished by the constitution or by the charter; and if its framers desired to go further, as the legislature has in some cases in county

legislation (*Potter v. Fowzer, supra*), they should have so provided in plain and unmistakable terms.

2. It appeared that about October, 1891, a deposit of the city's funds of $45,500, presumably the funds of the fiscal year 1891, was made by the treasurer in the California Savings Bank of San Diego. The bank failed in November, 1891, but the city auditor testified that this money "was carried in the bank, the same as if it was cash in the treasury"; that "the books showed just the same as if there was cash in the treasury." It so remained on the books until March 31, 1893, when a fictitious account, called "dividend fund," was entered on the books by which the various funds which had been credited with their proportion of this $45,500 were debited with like amounts, aggregating this total amount, and this so-called "dividend fund" was credited and thus the credit to the various funds was wiped out. In effect this dividend fund took the place of what in ordinary bookkeeping might be called "profit and loss account." An effort was made, by suit commenced in 1892, to collect some of this lost money, and some was collected, and, so far as we know, still other payments may be realized. The auditor testified that the ledger showed a credit by collections of $4,327.50 March 23, 1893, and $910 August 21, 1893. The trial court dealt with this $45,500 as unavailable, except as to the amount received, because apparently lost to the city through the failure of the bank. In this we think the court erred. The money was provided by the city and became a part of its funds against which liabilities might and did accrue, including the claims of the water company. It was said in *Montague v. English*, 119 Cal. 225: "The contract being valid in the first instance, we are unable to see how any event happening subsequent to that time can vitiate it. The mere fact that the fund upon which the party has relied for payment has become exhausted after he has furnished the material demanded by his contract and before presentation of his claim in no manner bears upon the validity of the contract or the legal liability of the city. Such unfortunate conditions facing the claimant only affect his remedy. The contract exists, and the liability of the city exists, but under the construction of this provision of the constitution, which declares that each

year's revenue of the municipality must pay each year's indebtedness, the claimant is bound to look for satisfaction of his claim in the year's income, and only there." The contract here is implied, but it is none the less valid for that reason. *Buck v. City of Eureka,* 124 Cal. 61, was also an implied contract on which the plaintiff was allowed by the court a general judgment. In the former appeal of the present case (*Higgins v. San Diego, supra*). it was held that plaintiff was entitled to an "ordinary general judgment . . . . without any direction as to the revenues out of which the judgment should be satisfied." And the further direction was given to ascertain when the plaintiff's claim "equaled the amount of unappropriated revenues for the respective fiscal years during which the city had the use of the water company's plant," etc. It cannot be said that the funds deposited in the bank were appropriated; they were part of the funds of the city while so deposited, as much so as while in the city treasury, and it was not until 1893 that they were written off the books. It is true the allowed claims of plaintiff could not be paid out of these funds simply because the money for the time being was beyond reach of the city; but this money constituted a part of the funds of the fiscal year, raised to meet legitimate claims, and must be treated as in the treasury for the fiscal year 1891 for the purpose of fixing the amount of plaintiff's judgment.

3. It is contended, touching the right of the company to recover all moneys paid out of the fund primarily applicable to its claims: 1. That all payments upon claims accruing subsequent to those of the company were illegally paid and cannot properly be deducted from the amount it shall recover. 2. That the payment of the expenses of operating the water plant under the lease was illegal because the lease was held to be void, and that the charter authorizes the appointment of water commissioners only when the city "shall become the owner of any water supply, or shall decide to construct a system of water supply." (Citing Stats. 1889, sec. 1, p. 694.) It is hence claimed that the payment of the salaries of the water commissioners and the other expenses of their offices was wholly illegal and void. Furthermore, it is urged that the salaries of these officers were illegally paid out of the water fund because, as that fund was illegally

created, the money therein in fact became a part of the general fund, out of which officers' salaries could not be paid.   And 3. That the city justice was wrongfully paid out of the general fund during the whole time.

We find nothing in the charter that makes the city liable in the order in which claims accrue against it.   In the absence of some such provision, "there is no obligation upon the municipality any more than upon any other debtor to pay the claims against it in the order in which they are incurred, unless they are presented in that order and in such condition and with such formalities as entitle the claimant to immediate payment." (*Weaver v. San Francisco, supra.*)   There is no priority of right among claimants dependent upon the order of time in which liabilities are incurred, given by the charter, so far as the different funds are concerned, except as to the water fund, and there the provision is that the salaries of the commissioners and the expenses of operating the plant shall be paid before payment is made of the monthly rental.

As to the point that the payment of the operating expenses of the water plant was illegal because the lease was void, it is a sufficient answer that these payments rest upon the same ground as payments for the reasonable use of the plant.   If, as was held here, that notwithstanding that the lease was void, the city was liable for the use of the plant, the city would certainly be authorized to make provision for payment, which it did by the organization of the water department and the water fund, and by the appointment of commissioners and other employees to conduct the department and collect the revenues.   This was done under the provisions of the charter found in sections 1 and 2, chapter VI.   (Stats. 1889, p. 694.)   But it is objected that this could only be done upon the city becoming the "owner of any water supply, or shall decide to construct a system of water supply," etc.; and it is contended that, inasmuch as the city never became the "owner" of any water supply, the water fund and the water department had no legal existence.   "The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others."   (Civ. Code, sec. 654.)   "The ownership of property is either: 1. Absolute; or 2. Qualified." (Civ. Code, sec. 678.)   We do not think the word "owner" oc-

curring in the charter was used in the sense that the city must be the holder of the title, but rather in the sense that it should have the control of a water supply. The term "owner" includes any person having a claim or interest in real property, though less than an absolute fee. · (*Lozo v. Sutherland,* 38 Mich. 171.) Anderson's Dictionary cites numerous cases in illustration of the principle that the term may designate the person in actual possession and occupancy of premises.

That the salary of the "city justice," so called, was paid out of the general fund for the whole period is urged as an illegal diminution of that fund, and therefore the money so used was available to pay the water company. We do not find in the charter any such officer named. A police court is established to be held by a "police judge," and the mayor is authorized to designate in writing any justice of the peace of the city, who "shall have power to preside in and hold the police judge's court," etc., in certain cases. Assuming that the city justice referred to is the one or the other of these judicial officers, and assuming that he should have been and could have been paid from the salary fund, but was instead paid from the general fund, what then? The water company could look to the general fund only at the end of the year. A warrant drawn upon this fund after it had become exhausted could not be paid, and this would be true even though the fund had become exhausted by payments of claims primarily payable from some other fund—the fact would be the same that there was then no money available in that fund. If the right to the surplus in this general fund had attached, and the company had demanded payment before the alleged illegal payment to the city justice, the case might be different, for the reason that at the time of such demand there would have been money in the fund available for its payment. The record does not show the facts in this regard. But the liability for the salary of the city justice was legally incurred and this is not questioned, and so the payment out of the general fund was not the payment of an illegal claim, but at the worst was the payment of a legal claim out of the wrong fund. If there was no authority for so paying it, the remedy was to transfer money from the proper fund to the general fund to reimburse the latter fund. This was not done, however, and we see

no way by which the remedy can be applied in this action. What was said in *Weaver v. San Francisco, supra,* quoted approvingly in *McBean v. Fresno, supra,* seems appropriate here: "Whoever deals with a municipality does so with notice . . . . that all other persons dealing with the municipality have the same rights to compensation and are subject to the same limitations as he is. Even though at the time of making his contract there are funds in the treasury sufficient to meet the amount of his claim, he is charged with notice that these funds are liable to be paid out for municipal expenditures before his contract can mature into a claim against the city and if others whose claims have accrued subsequent to his are able to intercept these funds, he is in the same condition as any creditor who has dealt with one whose assets are exhausted before he presents his claim. . . . . In dealing with the municipality, he must rely upon the integrity of its officers that they will not incur any liabilities during the year in excess of the income and revenues provided for that year, and, as a prudent man, he will ascertain not only the amount of the income, but also the amount of the claims already existing and of those that are likely to be incurred." In a concurring opinion in the former appeal of the case now before us, the chief justice expressed some dissent to this language as too broad, but the court has not receded from the position taken in former cases, and we do not see how it can do so without subjecting the municipality to a possible liability in excess of its revenues previously provided in an amount which may prove to be very burdensome.

Appellant complains of payments made out of the general fund other than the salary of the city justice; but they were legal claims, and the same thing is true of them as in the instance of the salary.

4. We are brought lastly to notice the contention that not only were the water fund and the general fund primarily applicable to the payment of the company's claims, but that the "street fund" and the "street sprinkling fund" were also so applicable. The charter established a " 'street fund,' from which must be paid all expenses for street repairs, street sprinkling and cleaning, highway and bridge repairs, and all other street improvements not otherwise provided for in this charter." The

only reason stated for claiming this fund as primarily liable is that it was liable for street sprinkling. The "street sprinkling fund" is claimed to be primarily liable because the water used for sprinkling streets was payable out of that fund. This latter fund was not established by the charter; the ordinance establishing it does not appear in the record, and we have no knowledge as to what expenditures were by the ordinance made payable out of this fund. The record contains the items of expenses paid out of it and they include water used for sprinkling streets, labor sprinkling streets, repairs of hydrants and sprinklers, purchase of hose, etc. The answer to appellant's contention as given by the learned trial judge, printed in respondent's brief, was as follows: "None of the company's claims, however, are founded on liabilities incurred for water furnished for street sprinkling. There is no evidence that any of the water furnished was used for that purpose. Aside from that, the company's claim is a general one arising out of the liability of the city to pay for the use of the company's plant and the value of the water supplied during the time the city retained possession of it." This seems to us a satisfactory answer. There is nothing in the charter or in any ordinance shown to us from which it may be reasonably inferred that either of these funds was primarily liable for the rent of the company's plant.

The judgment and order should be reversed and the cause remanded, the cause to be retried on the evidence used at the last trial, with leave to either party to submit further evidence.

Gray, C., and Cooper, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed and the cause remanded, the cause to be retried on the evidence used at the last trial, with leave to either party to submit further evidence.

Garoutte, J., Van Dyke, J., McFarland, J., Harrison, J.

BEATTY, C. J., concurring.—I concur in the judgment of reversal, but there are some points in the decision and some things said in the opinion from which I dissent. A passage is quoted from the opinion in *Weaver v. San Francisco*, 111 Cal.

319, with commendation. My reasons for dissenting from that doctrine are fully stated in my concurring opinion upon the former appeal of this case. (*Higgins v. San Diego,* 118 Cal. 529.) But even that doctrine does not sustain the conclusion reached in this case. In *Weaver v. San Francisco, supra,* it was held that a judgment against a city must be made payable out of the revenues of the year in which the claim accrued, but it was not held that the claimant could not have a judgment for the amount earned, because the money in the treasury at the time he made the contract, or coming in afterward, had been misapplied in payment of claims subsequently accruing and therefore void. Here, however, as I understand the opinion, it is held that the claimant upon a valid contract cannot have a judgment for more than is left in the treasury at the end of the fiscal year, although it be shown that large sums were paid out after its claim accrued upon claims that were invalid.

This is a doctrine which finds no support in anything that has ever been decided in any previous case in this court.

The right of the plaintiff to its judgment does not depend upon the ability of the defendant to pay it or the means of enforcing it. How the judgment is to be collected is a question wholly foreign to this case. All that we have here to decide is the amount of the plaintiff's valid claim and that is unaffected by any illegal expenditures made by the defendant after the respective monthly claims matured.