[S. F. No. 11177.   In Bank.—May 27, 1927.]

## MARGARET MAHONEY, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

[1] MUNICIPAL CORPORATIONS—INCURRING INDEBTEDNESS—LIMITATIONS —CONSTITUTIONAL LAW.—Under article XI, section 18, of the state constitution, no county, city, town, township, board of education, or school district shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof on or before maturity, which shall not exceed forty years from the time of contracting the same.

[2] ID.—ACQUISITION OF LAND AND IMPROVEMENTS—BONDED INDEBTEDNESS—SAN FRANCISCO CHARTER.—Under article XVI, section 29, of the charter of the City and County of San Francisco, when the supervisors shall determine that the public interest requires the acquisition of any land or lands or the construction or acquisition of any permanent building or buildings, improvement or improvements the cost of which, in addition to other expenses of the City and County would exceed the income and revenue provided for the City and County for any one year, they must by ordinance submit a proposition or propositions to incur a bonded indebtedness for such purpose or purposes to the electors of the City and County at a special election to be held for that purpose only.

[3] ID.—APPORTIONMENT OF REVENUE—CONSTRUCTION OF CHARTER.— Under the charter of the City and County of San Francisco, the apportionment and setting apart of the city's revenue and income into separate funds is mandatory, and the transfer of moneys from one fund to another or the use thereof for any purpose other than that for which the same were raised, except as specifically provided, is forbidden.

[4] ID. — INCURRING LIABILITY — LIMITATION OF. — The incurring of liabilities against the treasury of the City and County which cannot be paid out of the income provided, collected, and paid

1.  See 18 Cal. Jur. 879.

into the proper fund as its proportion of the same for the fiscal year, or permitting liabilities or indebtedness incurred in any one fiscal year to be a charge upon or paid out of the income or revenue of any other fiscal year, is prohibited by article III, chapter II, section 13, of the charter of the City and County of San Francisco.

[5] ID. — NATURE OF INSTRUMENT — DETERMINATION OF — INTENT OF PARTIES.—The agreement of the parties to an instrument that it shall be characterized as a lease cannot change its true character, and the evident intent and purpose of the makers as disclosed by the terms of the instrument must in such cases control.

[6] ID. — INCURRING LIABILITY — CONSTITUTIONAL RESTRICTIONS — UNCERTAINTY IN AMOUNT.—The force and effect of the constitutional restrictions against a municipality incurring liabilities beyond its revenues for the fiscal year may not be avoided—however beneficial such an avoidance may appear to be to the municipality by permitting it to carry forward its plan—and expenditures may not be incurred for improvements and for other public uses for which the municipality is liable and which, though not definitely fixed or even estimated, will inevitably exceed the income and revenue provided for the fiscal year in which the contract is entered into, or any future year, because, perchance, the question of the ability of the municipality to meet its obligations is left in a state of doubt or uncertainty occasioned by the phraseology of the contract, or upon the theory that the possible occurrence of an event which, in all probability will not happen, may happen, or the possible failure of a condition which must from the logic of the situation be performed, will not be performed.

[7] ID. — CONSTRUCTION OF CONTRACT — INVALID CONTRACT WITH MUNICIPALITY.—In this action to have declared invalid two certain agreements entered into between the City and County of San Francisco and a private corporation, it is held from a construction of the instrument designated as Exhibit "B" that, although in form a lease, it is in effect an agreement of purchase and that it is invalid as being in violation of article XI, section 18, of the state constitution, and article XVI, section 29, of the charter of the City and County of San Francisco, which prohibits the City and County from incurring any indebtedness or liability for any purpose exceeding in any ·year the income and revenue provided for such year without the assent of two-thirds of the qualified electors thereof voting at an election held for that purpose.

[8] ID.—ISSUE AS TO INVALIDITY OF INSTRUMENT—DETERMINATION OF. It is held in this action that the allegations of the complaint

tender issues of fact which ought to be considered in determining the validity of the instrument designated as Exhibit "A."

(1) 28 Cyc., p. 1533, n. 41.   (2) 28 Cyc., p. 1533, n. 40.   (3) 28 Cyc., p. 1641, n. 25.   (4) 28 Cyc., p. 1540, n. 36.   (5) 39 Cyc., p. 1175, n. 4.   (6) 28 Cyc., p. 1560, n. 68.   (7) 28 Cyc., p. 1548, n. 28. (8) 31 Cyc., p. 208, n. 80.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. George H. Cabaniss, Judge. Reversed.

The facts are stated in the opinion of the court.

C. K. Bonestell, H. W. Hutton, J. C. Flannery and William P. Hubbard for Appellant.

McCutchen, Olney, Mannon & Green for Respondent Spring Valley Water Company.

John T. Pigott, John J. O'Toole, present City Attorney, Dion R. Holm, Assistant City Attorney, George Lull, former City Attorney, and John A. Dailey, Assistant City Attorney, for Respondent City and County of San Francisco.

SEAWELL, J.—This action was inaugurated in the court below by plaintiff, Margaret Mahoney, a resident taxpayer of the City and County of San Francisco. The prayer of the amended complaint was for a decree of the court directing the delivery into court for cancellation of two certain instruments of even date purporting to be leases entered into by the Spring Valley Water Company, a corporation, and the City and County of San Francisco, upon the ground and for the reason that said instruments were in violation of article XI, section 18, state constitution, and article XVI, section 29, charter of the City and County of San Francisco, which provide generally and specifically, respectively, that said City and County shall not incur any indebtedness or liability for any purpose exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the qualified electors thereof voting at an election held for that purpose, and are, therefore, null and void and wholly without legal

effect; also, that said Spring Valley Water Company, designated in said instruments as lessor, and said City and County of San Francisco, designated therein as lessee, be perpetually enjoined from taking any further action or proceedings or exercising any right or privilege claimed to have been granted or conferred under or by virtue of said instruments or agreements, and that the City and County of San Francisco and certain of its officers be restrained and enjoined from auditing or approving any claim or demand or expending or paying out of the public funds of said City and County any sum or sums of money whatsoever claimed to be due or owing on account or by virtue of the terms or covenants contained in said instruments, and that the auditor and treasurer of said City and County be required to repay into the city treasury the sum of $24,000, with interest thereon, paid by said City and County to said Spring Valley Water Company as the first installment of rent as by the terms of one of said instruments provided and to repay any and all other sums that may thereafter be paid, audited, approved, or allowed by the agents of said City and County under said instruments. The complaint closes with a prayer for general relief and costs. The defendants Spring Valley Water Company and the City and County of San Francisco appeared separately and demurred to the amended complaint upon general grounds. The demurrer as to each defendant was sustained with leave to amend, and, the plaintiff refusing to further amend, judgment was entered against her. The appeal is taken from the judgment thus entered.

The major question presented by the appeal is whether the terms and provisions of the instruments before us—be they agreements of purchase or leases of real property—are violative of either the organic law of the state as expressed by article XI, section 18, state constitution, or of article XVI, section 29, charter of the City and County of San Francisco, or of the letter or spirit of the law as expressed in other provisions of said charter.

[1] Article XI, section 18, state constitution, provides: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the

assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof on or before maturity, which shall not exceed forty years from the time of contracting the same; . . . ''

[2] Article XVI, section 29, charter of the City and County of San Francisco, provides: ''When the Supervisors shall determine that the public interest requires the acquisition of any land or lands, or the construction or acquisition of any permanent building or buildings, improvement or improvements the cost of which, in addition to other expenses of the City and County will exceed the income and revenue provided for the City and County for any one year, they must, by ordinance, submit a proposition or propositions to incur a bonded indebtedness for such purpose or purposes to the electors of the City and County at a special election to be held for that purpose only. . . . ''

[3] The apportionment and setting apart of the city's revenue and income into separate funds is mandatory, and the transfer of moneys from one fund to another or the use thereof for any purpose other than that for which the same were raised, except as specifically provided, is forbidden. (Article III, chapter II, charter.) Each demand must show the fiscal year within which the indebtedness was incurred and the name of the specific fund out of which it is payable and have written or printed upon it a statement that the same can only be paid out of the income and revenue provided, collected and paid into the proper specific fund in the treasury for the fiscal year within which the indebtedness was incurred. (Article III, chapter II, section 13.) [4] Again, the incurring of liabilities against the treasury which cannot be paid out of the income provided, collected, and paid into the proper fund as its proportion of the same for the fiscal year or permitting liabilities or indebtedness incurred in any one fiscal year to be a charge upon or paid out of the income or revenue of any

other fiscal year, is prohibited by article III, chapter II, section 13, of said charter.

With the provisions of the organic law before us, it becomes necessary, for a determination of the question as to whether or not the terms, conditions, and covenants of said instruments or agreements, or either or any of them, are violative of the state constitution and said charter, to consider in connection therewith the substance of said instruments, which are annexed to and made a part of the complaint and marked Exhibits "A" and "B," respectively. In both instruments the Spring Valley Water Company is denominated the lessor and the City and County the lessee. For the sake of convenience we adopt the same identification references. By Exhibit "A" the lessor demises and lets unto the lessee all that certain real property situate, lying, and being in the city and county of San Francisco and described as a tract of land containing 170 acres, more or less, being a portion of that certain tract of land containing 811.13 acres of the so-called Lake Merced Ranch of the Spring Valley Water Company, adjacent to the municipal golf course as now located. The lease term is fifteen years, beginning on July 1, 1922, and terminating on June 30, 1937. The rentals for the term total $102,000 and are apportioned with reference to an ascending scale. The first installment of $2,000 became payable on July 1, 1925, and the remaining installments thereafter in gradually increasing amounts are payable on July 1st of each succeeding year, the last installment, amounting to $15,000, falling due July 1, 1936. In addition to said installments aggregating $102,000, the lessee agrees to pay annual installments equal in amount to the installments of all taxes, assessments, and other municipal or governmental charges levied upon said real property or any part thereof before the same shall become due. The leased property shall be used for a public golf links and playground only and shall be maintained for such purposes. The golf course is to be constructed according to a plan annexed to the lease and may be altered with the written approval of the lessor, except in the particular as to fairways. The construction shall include seeding to grass of all greens and fairways. The lease contemplates the construction by the lessee upon the premises of children's playgrounds and pedestrian and equestrian

paths and trails. The lessee agrees at all times to keep and maintain said golf course, playgrounds, paths, and trails in good condition and repair, and to cultivate the grass on all greens and fairways until a suitable grass sod has been developed and thereafter to maintain the same in a condition suitable for a golf course. The location and character of any clubhouse which the lessee may erect upon the demised premises shall be subject to the approval of the chief engineer of the lessor and the work of erecting the same shall not be commenced until such written approval has been obtained. Said lessee agrees to plant suitable shrubs and trees upon said premises according to a planting plan or schedule through a series of years and to care for the same. An adequate sewerage system of a sanitary type shall be constructed by the lessee in such locations as may be approved by the city board of health and by the chief engineer of the lessor. The lessee shall not, without the consent of the lessor, place upon said premises any building, fences, structures, or improvements except as expressly provided in the lease or as designated upon a plan of construction marked Exhibit ''A,'' which is not before us for inspection. No disturbance or change of the surface of the ground is permissible, except as expressly permitted or contemplated by the plans as shown by said Exhibit ''A,'' or without the written approval of the lessor's chief engineer. All work to be done or improvements to be made as provided by the lease or otherwise permitted shall be done at the sole expense of the lessee, and it is liable for all claims on account of materials and labor used or furnished in connection with the plan or scheme of improvement. The lessee agrees to police the premises at its own expense, protect the water and watersheds of the lessor from pollution, and also to protect the pipes, ditches, flumes, and other property of the lessor now used or hereafter to be constructed by it upon said premises, and to comply with all public health laws and requirements which the lessor may prescribe with respect to the use and occupation of said premises. Reservations of rights of way for pipes, ditches, flumes, conduits, structures, etc., on, upon, and through the premises and the right to enter and do any and all things necessary to manage, control, and protect the premises as a part of its water system and to develop the

water supply upon or in the same, are expressly made by the lessor. The lessee agrees to provide printed rules and regulations, which are to govern the conduct of all persons using said premises. The lessee also agrees to pay to the occupants of the premises who will be required to vacate the same by reason of the entry of said lessee actual damages sustained by said tenants, which are to be fixed by the agreement of the lessor and said tenants. Said lease provides that all repairs are to be made at the expense of the lessee, and the lessor has the right of entry for inspection purposes at all times. The lessor covenants that during the term "the lessee may peaceably have and hold the demised premises subject to the agreements, covenants, and conditions therein contained without hindrance by the lessor." In the event that the lessee fails or neglects to do or perform any act or thing on its part to be done or performed the lessor may, after notice, do or perform said act or thing at the expense of said lessee. Forfeiture of the lease by the lessee is provided in case of noncompliance with the terms and conditions of the lease with right of re-entry by the lessor without prejudice to any other remedy which it might have for arrears of rent or for damages for breach of covenant or condition broken. Neglect of the lessor to take advantage of any act, omission, or breach which would constitute grounds for the termination of the lease shall not be deemed to be a waiver of any subsequent cause or breach that might arise. In the event that the lessee shall purchase a larger tract of land of which the demised premises form a part the lease shall terminate. The lease contains the usual nonassignable clause without the written consent of the lessor, and a further provision that should the Railroad Commission refuse to authorize the lessor to enter into said lease it shall be deemed void and of no effect.

By Exhibit "B" the lessor demises and lets to the lessee a tract of land consisting of about 60 acres, situate in the City and County of San Francisco and more particularly described in an exhibit referred to but not before us. The lease term is ten years, beginning on July 1, 1922, and ending on June 30, 1932. The covenants for the payment of rent are: $24,000 upon the date of the agreement, the receipt of which is acknowledged; $36,960 on July 1, 1923. The balance of the annual installments are made payable

on the first day of July of each successive year, apportioned on a slightly descending scale through the life of the lease, aggregating $304,000 for the ten years' term. The lessee agrees to pay as additional annual rental installments an amount equal to the installments of all taxes, assessments and other municipal or governmental charges that may be levied upon or assessed against said real property. It is agreed by the parties that said real property shall be used for public park purposes only, and that the lessee shall, before October 1, 1922, commence the construction of a park and playground, including a wading and swimming pool, and diligently prosecute the same to completion and on or before July 1, 1924, complete the same. The construction of the park and playground and swimming pool shall conform to a plan which is not before us for examination, but which, it is alleged, will call for large annual outlays of the city's income, which are not provided for in any manner. In those features not herein specially noted, except as to the provisions granting the option to purchase, which will presently receive attention, said two leases in form and substance are quite similar. The material departure is found in that portion of the lease which grants the option to purchase. It is thereby provided that the lessee may at any time during the lease term, provided the lessee is not in default in payment of rent or in the performance of any of its covenants, purchase said real property for the sum of $240,000, with interest at the rate of six per cent per annum from and after the first day of July, 1922, by the payment of said purchase price at once or at any time thereafter. Said purchase price shall be reduced by crediting such payments as have been made on account of rents as therein provided. If the lessee elects to exercise said option it is required to notify the lessor in writing to that effect, and within sixty days after such notice said lessee shall pay to the lessor the purchase price and the latter shall then concurrently with said payment deliver to the lessee a deed of grant conveying to the lessee *"the title which the lessor has to said real property,* free and clear of liens and encumbrances hereafter created by the lessor, except the lien of taxes not then delinquent."    (Italics supplied.)    In the event that the option is exercised each annual installment of rent shall be credited and applied first

to the account of interest accrued at the date of the payment of such installment of rent, and the balance shall be applied to the principal of said purchase price as of the date upon which such installments were severally paid. Installments of rent in the amount of taxes, assessments and governmental charges shall not be credited on said purchase price.

It will be seen upon an inspection of the instrument that Exhibit ''A'' is in all essential features upon its face, a hiring of real property and an agreement between the parties limiting its use to certain purposes and reserving to the lessor certain proprietary rights as to its control and maintenance in connection with its use as a part of a public utility engaged in furnishing and supplying said city and county with water for domestic, manufacturing, and general commercial and useful purposes. There is nothing appearing upon the face of the lease and agreement that would justify us in holding, as a matter of law, that Exhibit ''A'' is an agreement or contract for the sale and purchase of said described 170 acres. Reference is made, however, to paragraph 26 of said lease, which provides that in the event the lessee shall purchase certain tracts of real property, of which said 170 acres is a part, the lease and agreement shall terminate therewith. The total amount of rentals to be paid to the lessor, to wit, $102,000, equals $40 per acre per year during the full term. The additional sums agreed to be paid by the lessee on account of taxes, assessments and municipal and governmental charges to which the property may be subject or liable and costs and expenses by reason of enforced compliance with the comprehensive program of construction, planting of trees and shrubs, laying out playgrounds, construction of a sanitation and sewerage system and other obligations assumed by the lessee are not capable of exact calculation. The allegations of the complaint are that said rentals, costs, and expenses will run into very large amounts and exceed the revenue that was or could have been provided to meet the accruing indebtedness for the fiscal year 1922–23. No data by which the cost of the improvements, such as a clubhouse and other necessary buildings, which the city is given the permissive right to erect and which in the contemplation of the parties will be

erected by the lessee, appear anywhere in the record before us. Conceding that Exhibit "A" may fairly be classed as a lease, the remaining question left for determination is whether the future income and revenues of the city may be burdened by obligations such as are imposed upon the municipality by the lease. In short, do the obligations therein provided come within the meaning of the term "indebtedness or liability," which is expressly forbidden to be incurred by the organic law of both state and city, except in those cases where the procedure of said organic law in such cases provided has been observed? If this question may be answered in the negative the further question arises as to whether the fixed installments of interest and other costs and expenses provided for by the lease and agreement may be said to be in excess of the reasonable ability of the municipality acting within its charter limitations as to taxation and considered with relation to the necessary costs and expenses of the administration of the city government in the performance of strictly municipal affairs, thereby contravening the provisions of the city's charter and the state constitution. The undisputed allegations of the complaint are that such a result will ensue.

[5] Exhibit "B" is in form a lease, but not quite as distinctly such in phraseology as Exhibit "A." The agreement of the parties to the instrument that it should be characterized as a lease cannot change its true character. The evident intent and purpose of the makers as disclosed by the terms of the instrument must in such cases control. (*In re City and County of San Francisco,* 195 Cal. 426 [233 Pac. 965].) That it is in effect an agreement of purchase is impelled by the language of the instrument and the logic of the situation. This conclusion is strengthened by the plan and scheme of the projectors to acquire additional outdoor areas for recreation and amusement to those which the city now possesses. There is sufficient in each exhibit or lease to indicate that the municipality is contemplating the carrying forward of a very comprehensive plan which, from necessity, would require ultimately the ownership of practically all of the lands described in the complaint, and possibly of other lands therein referred to. The plans as disclosed by the contracts irresistibly suggest interrelation and joint operation of one area with the other in the

accomplishing of a common plan and purpose. This suggestion, however, is rebuttable and may be overcome by evidence that either one of said tracts of land is desirable for the purposes set forth in said respective instruments notwithstanding a failure in an attempt to acquire both. We are of the opinion that the district court of appeal, first district, division two (Nourse, J.), adequately and correctly analyzed the effect of Exhibit "B" in a decision handed down by said court upon transfer made by this court of said cause for decision. We therefore adopt as a part of this opinion the reasoning, and conclusion reached in fixing the legal status of Exhibit "B":

"Turning to the second contract [B] we find that though this is denominated a lease and the contracting parties are referred to throughout the agreement as 'lessor' and 'lessee' it is in its very nature and purpose nothing more than a contract of purchase and sale whereby the city and county by payments which are denominated in the agreement as 'annual installments of rentals' actually has contracted to purchase the property through the payment of installments running over a period of ten years. By the terms of this contract the sum of $24,000 was required to be paid at the time of the execution of the agreement on July 1, 1922. The full purchase price for which the option to purchase was granted was the sum of $240,000 plus interest thereon at the rate of 6% per annum from the date of the execution of the agreement. The annual payments which were specified in the contract covered a period of ten years which upon examination appear to be made up in the following manner: The sum of $240,000 was divided into ten equal parts of $24,000 each. This was the payment required to be made upon the execution of the contract. On the first of July, 1923, the sum of $36,960 was to be paid and this sum consists of the sum of $24,000 plus $12,960, which is interest at 6% on the balance remaining due on the purchase price after the first payment had been made. On the first day of July, 1924, the sum of $35,520 was specified to be paid and this appears to be made up as follows: $24,000 on the principal and $11,520 being the interest on $192,000, the balance of the principal then remaining due. This method of computation and specification of the annual payments which are required to be made has been carried

all through the ten-year period until the total sum of $304,800 is required to be paid, which again is found to be $240,000 plus 6% per annum from July 1, 1922, on the remaining principal decreasing at the rate of $24,000 a year.

"In considering a similar contract which was also denominated a lease and which called upon the city and county to make annual payments termed rentals and which obligated the city and county to make vast expenditures of money for improvements, the Supreme Court in the so-called Marina case, 195 Cal. 426 [233 Pac. 965], held that the option to purchase the real property on the condition that all the covenants of the so-called lease had been met became 'in effect an increasing compulsion upon it to consummate such purchase, since not to do so would result in the irrevocable loss to the municipality not only of the primary and succeeding annual payments, which it is bound to make under this agreement, but also of the entire usufruct of the property during the period of its occupation, and also of the property itself.' In that case the Supreme Court carefully analyzed the provisions of the agreement under consideration which were in all material respects similar to the terms of the agreement found in exhibit B and held that it must be construed to be an agreement for purchase and not merely a lease as denominated by the parties. Having thus construed the agreement and having found that the obligations incurred thereby exceeded the income and revenue of the city and county for the year in which the obligation was incurred and that no provisions had been made for meeting such indebtedness as required by section 18 of Article XI of the Constitution, the Supreme Court held that the agreement was void as in contravention of the express limitations of that section. In so holding the court relied upon *Higgins* v. *City of San Diego,* 131 Cal. 294, 298 [63 Pac. 470]; and *Chester* v. *Carmichael,* 187 Cal. 287 [201 Pac. 925].

"The Marina case arose on a petition for a writ of mandate to compel the auditor of the city and county to audit and approve a warrant for one of the payments called for by the contract. In the course of the opinion the Supreme Court took occasion to refer to the fact that the petition for the writ was silent as to whether the creation of the liability under the agreement exceeded the income and revenue pro-

vided for that year, but the court held that inasmuch as it appeared that this was one of the grounds stated by the auditor for his refusal to audit and approve the warrant it was incumbent upon the petitioners to show affirmatively that the objection was not founded in fact. In the amended complaint before us it is alleged affirmatively that the expenditures required by the two agreements in suit exceeded the income and revenue provided by the city for the year 1922, and that no provision was made for the payment thereof through the proceeds of bonds issued for that purpose and that the assent of two-thirds of the qualified electors of the county had not been procured before said indebtedness was incurred. It is also alleged that in addition to the specified sums required to be paid annually under the two contracts the city and county obligated itself to make certain improvements upon the two tracts of land aggregating between two and three million dollars. Though it does not appear from the complaint what portion of this sum of two or three million dollars is required to be expended under the first contract and what portion is covered by the second, that is a question which should have been raised by special demurrer. Thus it may be that the first contract is nothing more than a lease calling for annual payments of rentals in addition to the cost of improvements upon the property and that this cost is not in excess of the constitutional limits. But if this is so the complaint states a better cause of action for equitable relief in relation to the second contract as the expenditures required to be made under that contract would be the greater in excess of the constitutional limits. Thus we have the question squarely presented in the complaint that by the terms of the two agreements the city has become obligated in a sum in excess of its annual income and revenue without having provided any method of meeting payment thereof as required by section 18 of Article XI of the Constitution, and such allegation must be met by answer . . . in order to take the contracts out of the inhibitions of that section of the Constitution.

"The defendants rest their case upon *McBean* v. *City of Fresno*, 112 Cal. 159 [53 Am. St. Rep. 191, 31 L. R. A. 794, 44 Pac. 358] , *Smilie* v. *Fresno*, 112 Cal. 311 [44 Pac. 556] , *Doland* v. *Clark*, 143 Cal. 176 [76 Pac. 958], and cases from other jurisdictions which need not be referred to. The dis-

tinction between the McBean case and others just cited is pointed out in *Chester* v. *Carmichael*, 187 Cal. 287 [201 Pac. 925], approved in the Marina case (195 Cal. 426, 441 [233 Pac. 965]), where it is said that the earlier case involved contracts for the furnishing to the city in the future of service, materials, etc., and that no indebtedness or liability within the meaning of the constitutional provisions was incurred until this service had been made. In the Marina case, as well as in the second contract here under consideration, the liability of the city and county is not one arising each year during the life of the contract to pay the stipulated sums due that year, but the city and county has at the outset obligated itself to make extensive improvements upon the land which the complaint alleges are far in excess of the annual income and revenue of the city and county. In the particular contract under consideration it will be noted that if the city fails to make these expenditures in accordance with the plans and specifications agreed on, then the 'lessor' may enter into the premises and make all the improvements called for, charging the 'expense' thereof to the city and county plus 10% interest. This feature of the contract, taken in view of the allegations of the complaint that the obligation thus incurred is in excess of the annual income and revenue of the city and county, is sufficient to take the contract out òf the rule of *McBean* v. *Fresno* and following cases, and for that reason the demurrer to the complaint should have been overruled.''

The reasoning of counsel in an attempt to convert the contract herein into the ''contingency'' class, such as is discussed in *Doland* v. *Clark*, 143 Cal. 176 [76 Pac. 958], *McBean* v. *Fresno*, 112 Cal. 159 [53 Am. St. Rep. 191, 31 L. R. A. 794, 44 Pac. 358], *Smilie* v. *Fresno County*, 112 Cal. 311 [44 Pac. 556], *State* v. *McCauley*, 15 Cal. 429, and others treating of similar situations, is fundamentally unsound. If the contracts in the instant case are not certain, definite, and fixed as to the mutual duties and obligations assumed by the parties thereto, it would be difficult, if indeed not impossible, to state a transaction that would be vulnerable to the remote, unusual, and unlikely contingencies suggested by appellants. Only such contingencies as might reasonably be expected to occur in the usual and ordinary course of business transactions or human relations

or reasonably within the purview of the contracting parties were considered in the case last above cited and relied upon by appellants, and not those which are remote or not within the contemplation of the contracting parties or beyond the foresight of ordinary prudent persons in dealing with the subject of the particular transactions. To hold, as an illustration, that the possibility of failure of title in the lessor of the demised lands is sufficient to create a contingency which would absolve the lessee from all liability to perform its covenants and thereby afford the means to avoid the constitutional and charter inhibitions by bringing the instant case within the rule announced in the decisions last above cited would require the further anomalous holding that the contracts are valid for the purpose of creating a contingency, but invalid for any other purpose.

[6] We do not understand that the force and effect of the constitutional restrictions may be avoided—however beneficial such an avoidance may appear to be to the municipality by permitting it to carry forward its plans—that expenditures may be incurred for improvements and for other public uses for which the municipality is liable and which, though not definitely fixed or even estimated, will inevitably exceed the income and revenue provided for the fiscal year in which the contract is entered into, or any future year, because, perchance, the question of the ability of the municipality to meet its obligations is left in a state of doubt or uncertainty occasioned by the phraseology of the contract, or upon the theory that the possible occurrence of an event which in all probability will not happen may happen, or the possible failure of a condition which must from the logic of the situation be performed will not be performed. If this be the rule of construction the restriction provisions of the constitution and charter would become practically nullities and there would be no opportunity for the taxpayers to be heard as to the incurring of indebtedness or liability that would become a charge upon the future income or revenue of municipal and public corporations. It would practically put an end to bond issues as provided by the constitution with respect to the incurring of future indebtedness or liability. If a vast indebtedness or liability may be incurred by contract whereby the payment is postponed to a future year, and which would beyond question

exceed the income that could or would reasonably be expected to be provided for, a condition would be brought about similar to that stated in *Arthur* v. *City of Petaluma,* 175 Cal. 216 [165 Pac. 698], which affords a striking example of the hardship that follows a failure to observe the organic law and which should be avoided in the interests of a sound public policy. The reason for the constitutional restriction is fully set forth in the case last cited and its purpose and wholesomeness have been too frequently elaborated by this court to require further comment. It is true that some color of justification for the incurrence of the liability herein attempted is to be gleaned from *McBean* v. *Fresno, Doland* v. *Clark, Smilie* v. *Fresno County,* and *State* v. *McCauley.* The first of these cases was a case of an emergency nature and involved the exercise of the police power in its highest sense, to wit, the preservation of the public health. *In re City and County of San Francisco,* 191 Cal. 172 [215 Pac. 549], was likewise a health case, involving the care of persons afflicted with tuberculosis. The McBean case was no doubt written under the urge of the necessities of the situation, and this court has since been careful not to extend the rule beyond the facts therein stated, and has, as a matter of fact, distinguished that case from subsequent cases, thereby giving effect to the constitutional provisions. The Smilie case, reported in the same volume as the McBean case, was rested absolutely on the authority of the latter case. The McBean case also dominated the decision in the Doland case. The McBean case was definitely distinguished from *Chester* v. *Carmichael,* a case similar to the instant case. The outstanding facts of that case and legal principles announced therein cannot be distinguished from this case, nor do the minor differences of detail minimize its force as an authority here. We do not deem it necessary to state the facts in detail. Two parties executed a conveyance of a tract of land to the city of Sacramento to be used as a park and playground. The conveyance was subject to nine conditions subsequent, which were generally for the laying out and improvement of the grounds suitable to the purposes for which they were conveyed; an agreement for the payment by the city of any assessments that might be levied against it and the payment of the taxes for the year 1919; the expenditure by the city

of a minimum sum of $5,000 for improvements during the year 1920 and a like expenditure each year thereafter until the entire property had been improved as a park; a forfeiture clause in the event the city failed to comply with the conditions therein and a reversion of the property to the grantors. The cost of the construction work exceeded the sum of $50,000 and the cost of maintenance $5,000 per annum. The conveyance, which was accepted by the city, was dated December 1, 1919, and all of the funds for the year 1919 were exhausted before December 31, 1919. There had been no assent on the part of the qualified electors to the carrying out of the proposed plan. This court held that the doing of the work with a prescribed minimum expenditure for each year was the purchase price for the land, payable in yearly installments, the grantors having fully performed their part by conveying and delivering the land. Notwithstanding the absence of any liability for damages for failure to perform and the fact that the obligation could not be specifically enforced, there was an obligation in favor of the grantors involving the expenditure in a certain way and for certain purposes of the revenues of the city, accompanied by what was in substance a pledge of the property conveyed as security for its performance. That the matter was cast in the form of conditions subsequent was deemed unimportant. In substance and effect the transaction was as above stated. The transaction was held to fall within the inhibition of section 18, article XI, of the constitution, which precludes any city from incurring "any indebtedness or liability in any manner or for any purpose" exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the qualified electors thereof. The city, as it was there said and as is true in the instant case, "must either expend all the money necessary to complete the work from its future revenues or lose the property with all it may have paid to the time of loss in improving the same. . . . The manner in which the indebtedness is created is immaterial if the result is to subject the city to a present liability, direct or indirect, which the tax-payer eventually will be called upon to meet. It seems to us that such will be the result of the ingenious scheme that has been devised in the present

case.    We think the statute cannot be evaded in the manner proposed.'' The distinction between that case and the Mc-Bean, Smilie, and Doland cases, *supra,* is pointed out. The latter cases cited involved contracts for the furnishing to a city in the future of service, materials, etc., and it is held that no indebtedness or liability within the constitutional provision is incurred until the furnishing of the service, materials, etc., the consideration for the payment to be made, while in the former the full liability was created upon the acceptance of the deed. Here the consideration was the execution and acceptance of the contract of purchase and the putting of the City and County of San Francisco into possession of the property.

[7] The last expression of this court upon a situation similar to the one at hand is the so-called Marina case, decided subsequent to the decision made by the trial court in the instant case. The principles of law therein announced are applicable to the facts as alleged by the amended complaint in the present case so far as Exhibit ''B'' is involved on the hearing of the demurrer and compel the same conclusion as was reached in that case. In other words, the city in the instant case did not have the power, as a matter of law, to enter into the contract designated as Exhibit ''B.''

[8] The allegations of the complaint tender issues of fact which ought to be considered in determining the validity of Exhibit ''A.'' It is alleged that the liabilities thereby assumed by the city do by both direct and indirect methods incur an indebtedness in excess of the income or revenue provided by said city and are, therefore, void as being in violation of the state constitution and city charter. In the absence of an answer denying said allegations they must stand admitted. We do not deem it necessary to pass upon said issues at the present time as they may be more properly and orderly disposed of after the proofs have been made in accordance with the issues tendered.

Judgment reversed.

Richards, J., Curtis, J., Waste, C. J., Tyler, J., *pro tem.,* and Preston, J., concurred.