[S. F. No. 10486.   In Bank.—May 17, 1923.]

In the Matter of the Controversy Between the CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation) and the COUNTY OF ALAMEDA (a Political Corporation), on the One Part, and THOMAS F. BOYLE, as Auditor, etc.

[1] CONTRACTS — CONSTRUCTION — OBJECT.—The object to be attained is the principal factor for consideration in the construction of contracts.

[2] COUNTIES—CONTRACTS WITH EACH OTHER—ACTS OF JULY 29 AND AUGUST 2, 1921.—The act of July 29, 1921 (Stats. 1921, p. 542), permitting counties or municipalities to jointly exercise common powers by agreement, and the act of August 2, 1921 (Stats. 1921, p. 1641), providing for the care of tuberculosis patients, are separate and distinct, and provide different methods for the accomplishment of some of the objects common to both, and neither is intended to be exclusive in its operation.

[3] ID.—BUREAU OF TUBERCULOSIS—ACT OF AUGUST 2, 1921.—By conforming with the regulations approved by the state bureau of tuberculosis, as provided by the act of August 2, 1921 (Stats. 1921, p. 1641), any group of counties organized thereunder is entitled to receive state aid.

[4] ID.—PURPOSE OF ACT.—The evident purpose of said act is not alone to provide for the joint ownership of buildings and real property and the joint management of hospitals by the members of the group who have contributed money to that end, but also to place said institution in a limited sense under the supervision of the state board of health.

[5] ID.—CARE OF TUBERCULOSIS PATIENTS—ACT OF JULY 29, 1921.— Where a city for reasons sufficient to itself does not purpose or desire to construct buildings or purchase real estate, jointly or at all, and neither party desires to be placed under state supervision, but the city finds that it will be to the advantage of its patients affected with tuberculosis and also to itself to place said patients for care and treatment in a neighboring county, it may, under the act of July 29, 1921 (Stats. 1921, p. 542), enter into a contract with such county for such purpose.

[6] ID.—FUTURE PAYMENTS.—The question as to the ability of a city to meet any future liability or indebtedness growing out of such a contract in excess of the revenues for the year in which such liability accrues, as provided in article XI, section 18, of the constitution, is prematurely presented in a proceeding in

*mandamus* to compel the issuance of a warrant for the payment of architect's fees incurred for the preparation of plans and specifications for the construction of additional units to a tuberculosis hospital of another county, where it is admitted that the amount of such fees is available at the time for the purpose.

[7] ID.—WISDOM OF CONTRACT.—The wisdom of such a contract having been left to the discretion of the municipal bodies, it cannot be reviewed by the courts.

[8] ID.—USE OF PUBLIC BUILDINGS BY OTHER COUNTY.—There is nothing in the organic or statutory law of this state forbidding the use of public buildings belonging to one county by another for administrative purposes.

[9] MUNICIPAL CORPORATIONS—TREATMENT OF TUBERCULAR PATIENTS—SAN FRANCISCO CHARTER.—The board of supervisors of the city and county of San Francisco, under the amendment of the charter approved January, 1923, has the power to enter into a contract for the maintenance and care of tuberculosis patients in hospitals outside the municipal limits, owned, operated, and maintained by another county, or may by contract with other counties provide for the joint ownership, operation, maintenance, and control of a hospital for the treatment of persons suffering from tuberculosis.

APPLICATION for a Writ of Mandamus to compel the Auditor of the City and County of San Francisco to audit certain demands under an ·agreement between that City and County and the County of Alameda. Writ granted.

The facts are stated in the opinion of the court.

George Lull, City Attorney, for the City and County of San Francisco.

Ezra Decoto, District Attorney, for County of Alameda.

Edward F. Moran for Thomas F. Boyle, Auditor of the City and County of San Francisco.

SEAWELL, J.—This is an application for a writ of *mandamus* to compel Thomas F. Boyle, as auditor of the City and County of San Francisco, to audit and approve a demand allowed and approved by each board and officer of said city whose approval was necessary to its allowance, existing in favor of the County of Alameda in the sum of $5,000 on account of costs and expenses incurred by said

county in the preparation of plans and specifications and for the payment of architect's fees incurred for designing and planning certain proposed units to be added to the tuberculosis hospital maintained by the County of Alameda, and known as the Arroyo Sanitarium, situate near Livermore, for the use and benefit of the City and County of San Francisco in the care, maintenance, and treatment of its patients affected with tuberculosis, as provided by the terms of an agreement entered into March 8, 1922, between said City and County, a municipal corporation, operating under a freeholders' charter, party of the first part, and the County of Alameda, a political corporation, party of the second part. The auditor claims that said agreement is invalid and therefore refuses to audit or approve said demand drawn in favor of Alameda County. This proceeding is designed to test the validity of the agreement.

By said agreement the City and County of San Francisco proposes to further obligate itself to make certain payments to the County of Alameda for annual deterioration of said units and to also compensate said county for the care, maintenance, and treatment of its said tubercular patients as will hereafter fully appear. The controversy, which is between the City and County of San Francisco and the County of Alameda joined on the one side, and Thomas F. Boyle, as auditor of said City and County of San Francisco, on the other, is submitted on an agreed statement of facts as provided by sections 1138–1140 of the Code of Civil Procedure.

By the agreement said City and County is designated "City" and said County of Alameda, "County." We adopt these designations omitting quotation marks.

It is admitted that every preliminary proceeding required by law to be taken by said City and said County and by the officers of each or both, whether formal or jurisdictional in character, was accordingly taken and said proceedings are regular and sufficient in every respect and there was and is sufficient money in the general fund available to pay said demand. In brief, it is conceded that petitioners are entitled to have said writ issue against said auditor, provided said City and County are permitted by law to enter into such an agreement as is here attempted to be enforced.

In a statement of the substance of the agreement which follows, much of its phraseology will be preserved. It recites by way of preamble that the City maintains within its corporate limits a general hospital wherein its sick and disabled inmates are cared for, including a large number affected with tuberculosis. The surroundings within the zone in which said Arroyo Sanitarium is situated are admittedly more favorable to the recovery of persons so afflicted than is the climate of said City. It was therefore the judgment of the City that approximately sixty of its tubercular patients should be cared for in the sanitarium of said County. An agreement was accordingly entered into between said parties by the terms of which said County agrees to construct additional units to its sanitarium for the care of said patients. The City agrees to advance said County a sum of money equal to the total costs of constructing said additional units of sufficient size and capacity to properly care for sixty patients, including fees of architect, superintendence, and construction. The sum so advanced is to be held in a special fund from which said County may deduct each year during the life of the agreement an annual allowance for depreciation and obsolescence of four per cent computed on the total cost of the construction of said units, including the cost of superintendence, inspection, and architect's fees. Immediately upon the execution of the contract the City shall advance to the County the sum of $5,000 to be held by said County as a fund to cover the costs of the architect's fees for preparing plans and specifications for said additional hospital units and the County on its part agrees upon payment thereof to immediately cause to be prepared plans and specifications for the construction of said units for the accommodation of approximately sixty patients and it is to submit said plans and specifications with an estimate of the cost of constructing said units to said City for its approval. Upon approval of said plans and specifications by said City the County agrees to enter into a contract for the construction of said units in accordance with said plans and specifications, which contract shall also be submitted to said City for its approval. Upon the letting of the contract after approval by said City the latter is to advance and to pay to the County the amount of money necessary to completely construct said units in accordance

with the plans and specifications, including the total amount of architect's fees and costs of superintendence and inspection. No changes or alterations are to be made in the plans and specifications after contract let except with the mutual consent of both parties. If changes be agreed to which increase the contract price, said increase is to be borne by the City and paid for upon completion of the contract. If said changes decrease the contract price the amount of decrease shall be returned by the County to the City upon completion of said contract. Thereupon an adjustment shall be made of the estimated fees paid to the architect and of the moneys paid for superintendence and inspection by the City. Should the estimated amount paid by the City exceed the cost of such services the excess shall be repaid by the County to the City. Should the said estimated amount be less the City shall pay the difference to the County. It is further agreed that if the parties should be unable to agree on the plans or specifications or the contract, the County shall in no event be required to return to the City any part of said sum of $5,000 paid to it to be applied on account of the architect's fees to the extent that it has actually incurred a liability for such purposes. The County agrees that it will wholly equip said units at its own cost and expense and board, maintain, and care for such tubercular patients as the City may send to said sanitarium, not exceeding fifty in number at any one time; the City on its part agrees to pay for the board, maintenance, and medical care of said patients at the rate of $2.87 per day per patient subject to such modification at the end of each fiscal year as the parties may agree to make and upon failure to agree said rate of $2.87 per patient per day shall remain in full force and effect during the life of the agreement or until otherwise changed by mutual consent. All payments for maintenance and care of such patients are to be made monthly during the life of the agreement.

The contract is to continue in force and effect for a period of twenty-five years unless sooner terminated by mutual consent or by the act of either party thereto by giving one year's notice to the other of its intention to terminate it. The right of either party to terminate is expressly reserved. Upon the termination of said contract by either party prior to the expiration of its full term the County shall return

to the City the full amount of money advanced to it to cover the architect's, superintendence and inspection fees, and the total costs of construction of said units less the annual deduction of four per cent to cover depreciation and obsolescence on the entire cost, including architect's fees, etc.

The administration and control of said sanitarium is to remain exclusively with the County of Alameda and the City agrees to comply in every way with the rules and regulations of said sanitarium and to conform to the standard of admission adopted by the governing body of said sanitarium. The City agrees to remove any patients whose removal may be requested by the superintendent of said institution and the patients shall be amenable at all times to the rules and regulations prescribed by the superintendent or governing body thereof. Said rules shall have a uniform application to patients of both parties to the contract. It is also a part of the contract that any sums of money received from the state of California for the care of such tubercular patients as the City may send to said sanitarium may be retained by the City and if such moneys should be paid by the state to the County the amounts so received shall be credited as payments made from said City for the care of such patients. This concludes a statement of the substance of said contract.

[1] The object to be attained is, of course, the principal factor for consideration in the construction of contracts. To make provision for the care of indigent sick and dependent poor is a duty of state and society so well understood and thoroughly recognized that time devoted to a discussion of the subject would be but little better than wasted. A duty equally as great rests upon the state to protect and guard the health of the public from infectious or other communicable forms of diseases, one of the most widely prevalent of which is tuberculosis. Article IV, section 22, of our state constitution, and various statutes, make special reference to and provisions for the care and treatment of persons suffering from this dreaded disease. The board of supervisors of the City and County of San Francisco in dealing with the question found as a fact that the zone in which it proposes to maintain and care for its patients affected with tuberculosis possesses a more favorable climatic condition and superior surroundings for the success-

ful treatment of the disease than is possessed by said City and County. Without such a finding of fact, which is conclusive on us, we would be permitted to take judicial notice of the geographical position of the two localities with reference to proximity to the sea and the influence of ocean winds on the climate of each and also the density of the population of each considered relatively in respect to areas. In the treatment of pulmonary forms of tuberculosis the main reliance for improvement or cure rests largely upon the accessibility of the patient to pure, fresh air such as altitude and open areas afford. Rest and quiet are other essentials. From recitals found in the agreement the board of supervisors was unquestionably induced or influenced to enter into said contract by a proper consideration for the comfort and welfare of the affected patients, as well as the discharge of a duty which is cast upon it to protect the health of the public.

We shall not discuss the objections made by petitioner in *seriatim* order inasmuch as many of them are included within or are incidental to the major questions of law which must control the decision.

The authority under which the City justifies its right to make the contract is statutory and became effective July 29, 1921. (Stats. 1921, p. 542.) The act is brief and is here set out in full, including its title:

"An act providing for the joint exercise of powers by counties, by municipalities or by municipalities and counties.

"Section 1. Two or more counties, two or more municipalities or one or more municipalities and one or more counties, by agreement entered into respectively by them and authorized by their legislative bodies, may jointly exercise any power or powers common to the several contracting parties.

"Sec. 2. Such agreements shall state the purpose of the agreement or the power to be exercised and provide for the method by which the purpose sought shall be accomplished or the manner in which the power shall be exercised.

"Sec. 3. The parties to such agreement may provide that contributions from the treasuries may be made for the purpose for which the agreement was entered into or payments of public funds shall be made to defray the cost thereof which funds may be made to and disbursed by such agency

as may be agreed upon; *provided, however,* that the method of disbursement shall agree as far as the same is practicable with the method provided by law for the disbursement by the parties to such agreement. Strict accountability of all funds and report of all receipts and disbursements shall be provided for.

"Sec. 4. Such agreements may be continued for a definite term or until rescinded or terminated and may provide for the method by which the same may be rescinded or terminated by any of the parties thereto.

"Sec. 5. Such agreement shall provide for the disposition, division or distribution of any property acquired as the result of such joint exercise of powers, and the return of any surplus moneys on hand after the purpose thereof shall be completed in proportion to the contribution made."

It is also a claim of the auditor that the act above set out was superseded by a more elaborate and comprehensive act passed at the same session of the legislature but at a later date, which act provides for the construction of hospital buildings by groups of cities, counties, or cities and counties, and for the management, maintenance, support, and care of persons affected with tuberculosis. Its title in full is as follows: "An act to amend sections two and three of an act entitled 'An act to provide for the establishment and maintenance of a bureau of tuberculosis under the direction of the state board of health; defining its powers and duties; providing for the granting of state aid to cities, counties, cities and counties, and groups of counties, for the support and care of persons affected with tuberculosis; making an appropriation therefor, and repealing certain acts of the legislature of the state of California,' approved June 12, 1915, as amended." In effect August 2, 1921. (Stats. 1921, p. 1641.) Under the plan outlined by this act the board of supervisors representing each respective county forming said group is empowered to appoint one of its said members as a delegate to represent it. The delegates from the several counties shall constitute a central committee which is given certain powers, acting with other committees of its creation, to superintend the construction of the building, approve the bills, and do the usual things required of a building committee. The central committee constitutes the governing body of the hospital and may make appropriate rules

for its government and management.  By conforming with the provisions of the statute providing for organization and management every city, county, city and county, or group of counties, which is a member thereof, is entitled to receive from the state the sum of $3 a week for each person suffering from tuberculosis cared for therein at public expense who is unable to pay for his support and has no relative legally liable and financially able to pay for his support and who has been a *bona fide* resident of the state for one year; provided, that no city, county, city and county, or group of counties shall be entitled to receive state aid unless a tuberculosis ward or hospital conforms to the regulations of and is approved by the state bureau of tuberculosis.

[2]  In short, it is the claim of the auditor that cities, counties, cities and counties desiring to join in a group as provided by said act must conform to the provisions thereof and that such provisions furnish exclusive and, in fact, the only source of authority for legal existence.  With this contention we are unable to agree.  The acts before us are separate and distinct and provide different methods for the accomplishment of some of the objects common to both. The subjects treated therein are not wholly identical and the more elaborate machinery provided for the operation of one plan or scheme is not appropriate or necessary for the operation of the other.  Neither are the acts coextensive in scope. We think, therefore, that each authorizes the adoption of a plan and procedure independent of the other and that neither one was intended to be exclusive in its operation. [3]  By conforming with the regulations approved by the state bureau of tuberculosis as provided by the more recent act any group of counties organized thereunder is entitled to receive state aid.  [4]  The evident purpose of said act is not alone to provide for the joint ownership of buildings and real property and the joint management of hospitals by the members of the group who have contributed money to that end but also to place said institution in a limited sense under the supervision of the state board of health. Such a plan of ownership and management does not suit the purposes of the parties to the contract before us.  [5] The City for reasons sufficient to itself does not purpose or desire to construct buildings or purchase real estate, jointly or at all.  Perhaps neither party desires to be placed under

state supervision. The City finds that it will be to the advantage of its patients affected with tuberculosis and also to itself to place said patients for care and treatment in a neighboring county. The statute under which the City assumes to act was undoubtedly designed to meet the exigencies of the situation found to exist by the legislative body of said City. We have not been pointed to any authority which inhibits the City from bringing itself within the provisions of the statute under which it desires to operate and we know of no reason why it should be prevented from doing so.

[6] By the admission of the auditor that the sum of $5,000 is available for and has been set aside for the payment of the architect's fees incurred for the preparation of plans and specifications the question as to the ability of the City to meet any future liability or indebtedness growing out of said contract in excess of the revenue provided for the year in which said liability accrues as provided in article XI, section 18, state constitution, and article III, chapter 3, section 13, charter of the City and County of San Francisco is removed from the case. Whether the City will be able to meet the payment of an undetermined sum equal to the total cost of the construction of the hospital units to fall due on a day *in futuro* is a question prematurely presented and cannot be decided in this controversy. It has not been made to appear that a contract of any kind has yet been entered into between said City and County for the construction of said units at an agreed price or at all. The contract before us provides for the adjustment of the rights of the parties in case of failure of the parties to agree on plans and specifications and on other essential matters which are to be the subjects of a future contract, but in no event would we be justified in presuming, in the absence of a showing to the contrary, that the City would not be amply prepared to meet its future obligations or that it will not keep within the law in respect to charter and constitutional restrictions. We are not at liberty to condemn in advance of its preparation and execution the contract to accomplish the general purposes outlined by the agreed statement of facts on suspicion that the City in carrying it to completion may incur an indebtedness or liability in any one of the years through which it may extend

in excess of the revenue provided for such year without the
assent of two-thirds of the qualified voters thereof voting
at an election to be held for that purpose, etc., as inhibited
by article XI, section 18, state constitution, and by similar
provision of the city charter. The objection urged by the
auditor against municipalities engaging in contracts pro-
viding for installment payments extending through a series
of years and the general constitutional question here raised
is elaborately discussed in *McBean* v. *City of Fresno,* 112
Cal. 159 [53 Am. St. Rep. 191, 31 L. R. A. 794, 44 Pac.
358]. The city of Fresno entered into a contract with Mc-
Bean by which he agreed to care for and dispose of the
sewage of the city for a period of five years for the sum
of $4,900 per annum, payable quarterly. The contract was
complied with for a period of three years but before its
completion the city refused to further perform. In con-
struing the city's charter provisions and the constitutional
inhibition this court said: "In the case of contracts extend-
ing over a period longer than one year, it may be readily
seen that the municipality is abundantly protected, and that
it is the contractor therewith who subjects himself to peril
and risk of loss. If there are not revenues for any given
year sufficient and available for the payment of his claims
for that year, those claims become waste paper and are not
carried over as a charge against the income and revenue of
a succeeding year. . . . When it comes to considering the
contractual relations between the city and appellant, it is
at once seen that the city cannot be liable in any one year
for more than $4,900, an amount far within the revenue
derived from the sewer fund; and, further, that it cannot
become liable for this amount at all until faithful service
rendered by the contractor each year. If the city in any
one year shall fail to collect into its sewer fund money
sufficient to pay the just claims of the contractor, then, as
above said, it would be the contractor's loss, the city would
be chargeable with no financial responsibility therefor, and
the result at the most, so far as it was concerned, would be
a failure upon the part of its officers to observe good faith
in their dealings. . . . We base our views upon the convic-
tion that, at the time of entering into the contract, no debt
or liability is created for the aggregate amount of the in-
stallments to be paid under the contract, but that the sole

debt or liability created is that which rises from year to year in separate amounts as the work is performed." The court adopts the language of Chief Justice Field in *State* v. *McCauley*, 15 Cal. 429, where the question is elaborately argued and fully considered. Article VIII of the constitution, as it then stood, inhibited the legislature from creating any debts or liabilities in any manner which would exceed the sum of $300,000 except under certain specified contingencies within which the contract there considered could not be brought. The state made a contract for the care of its prison, for convict labor, etc., for the period of twenty-five years, agreeing to pay therefor the sum of $10,000 per month. Chief Justice Field, delivering the opinion of the court, said: "The unconstitutionality of the act is asserted on two grounds: 1. That it appropriated the sum of six hundred thousand dollars, and thus created a debt or liability against the people of the state exceeding the limit prescribed by the eighth article of the constitution. . . . The contract provides for the payment of ten thousand dollars a month, and the act appropriates this sum per month. The appropriations are to take effect, and the services are to be rendered, in the future. Until the services are rendered there can be no debt on the part of the state. The lessee could not have claimed, at any time after the making of the contract, the aggregate of all the monthly installments, because the state never owed him that amount. The state only became indebted as the services were each month performed. . . . The eighth article was intended to prevent the state from running into debt, and to keep her expenditures, except in certain cases, within her revenues. These revenues may be appropriated in anticipation of their receipt as effectually as when actually in the treasury. The appropriation of the moneys when received meets the services as they are rendered, thus discharging the liabilities as they arise, or rather anticipating and preventing their existence. The appropriation accompanying the services operates, in fact, in the nature of a cash payment." Continuing, the court said: "This interpretation, after further consideration and argument, was reaffirmed in *People* v. *Brooks*, 16 Cal. 1, and again in *Koppikus* v. *State Capitol Commrs.*, 16 Cal. 248. In *People* v. *Arguello*, 37 Cal. 524, it is said: 'A sum payable upon a contingency is not a debt, or does not become a

debt until the contingency has happened.' '' (See, also, *Coulter Dry Goods Co.* v. *Wentworth,* 171 Cal. 509 [153 Pac. 939.]; *Doland* v. *Clark,* 143 Cal. 181 [76 Pac. 958]; *Fresno etc. Co.* v. *McKenzie,* 135 Cal. 497 [67 Pac. 900]; *Higgins* v. *San Diego,* 131 Cal. 298 [63 Pac. 470]; *Higgins* v. *San Diego Water Co.,* 118 Cal. 524 [45 Pac. 824, 50 Pac. 670]; *San Francisco Gas Co.* v. *Brickwedel,* 62 Cal. 642.)

The objection that the contract permits of the loaning of the credit of the City in violation of article IV, section 31, of the constitution is not supported by the facts of this case. There is no loan of either money or credit, or the pledging of the credit, or the making of any gift within the inhibition of said section. The setting aside of a fund by the City equal to the building cost of a hospital for the City's use and benefit in its construction, and the annual allowances for deterioration is but conforming to the usual course of business in estimating allowances for inevitable loss occasioned by usage and the elements. Included in the allowance for obsolescence was considered, no doubt, the right of enjoyment of the occupancy of said hospital by the City's patients. It may be said with equal force as it was said in *Veterans' Welfare Board* v. *Jordan, etc.,* 189 Cal. 124 [22 A. L. R. 1515, 208 Pac. 284], that as no debt whatever is created there can be no loan of credit. The City proposes merely to establish a fund from which certain definitely stated sums are to be disbursed for a purpose provided by law.

[7] The argument that the agreement is an improvident and unwise one for the City to make is one often heard in opposition to municipal contracts. It is effectually answered by a restatement of the rule that ''When the legislature has committed to a municipal body the power to legislate upon given subjects, or has committed to it judgment or discretion as to matters upon which it is authorized to act, courts of equity have no power to interfere with such a body in the exercise of its legislative or discretionary functions. That the power conferred upon the board of supervisors by law relative to the purchase of land for a hospital site, the erection of hospital buildings and their equipment, is both legislative and discretionary in character, is not open to dispute. The law casts upon the board the duty of determining whether in its judgment the public necessity

required the county to acquire a new hospital and conferred upon it the power necessary to accomplish this if it should so determine. . . . Whether in the exercise of legislative powers the board acts wisely or unwisely is no concern of the courts.'' (*Nickerson* v. *San Bernardino,* 179 Cal. 522 [177 Pac. 467]. See, also, 7 Cal. Jur., sec. 42, pp. 450, 451; *Stockton R. R. Co.* v. *City of Stockton,* 41 Cal. 147, 168; *Los Angeles County* v. *Dodge,* 51 Cal. App. 492 [197 Pac. 403].) The fact that any gross sum which the City may set aside for said uses may be wholly consumed upon the expiration of the full term of said contract was no doubt fully considered and weighed by both parties, together with all matters pertinent to their engagements. Such a result would not of itself be conclusive proof of a bad bargain on the part of the City. The fund may become depleted at the expiration of the contract term and still substantial benefit may have accrued to both parties thereto. In forming its judgment it must be presumed that the City considered the wisdom and policy of the whole plan in the light of the objects to be attained. The answer to adverse criticism is that the judgment of the City is conclusive in the absence of a showing of want of jurisdiction on the part of the City or a showing of bad faith on the part of its officers or gross extravagance or the existence of some fact sufficient to vitiate the contract.

[8] We find nothing in the organic or statutory law of this state forbidding the use of public buildings belonging to one county by another for administrative purposes. Direct authority can be found permitting it in cases of emergency or necessity. The board of supervisors of the City and County of San Francisco determined it to be necessary in the interest of public health that a limited number of its patients, affected with tuberculosis, should be transferred to a hospital or sanitarium of a neighboring county. Whether the plan adopted could be improved upon is not a question for our determination. Any method or system devised would be subject to criticism. However this may be we are unable to see any legal objection to the plan proposed. Neither has it been made clear that the proposed plan should be declared invalid for the reason that the County retains supervisory control of the hospital. Any institution designed for treatment of persons affected with

tuberculosis must from necessity be under the direction and management of skilled, efficient persons. There doubtless exist good reasons for protecting persons who are suffering in the incipient stage from those who are suffering in the more advanced stages, thus requiring rules of classification according to the stages of the disease. There may also be good reasons for the rejection or removal of patients whose reception or retention would endanger the welfare of others. Reasonable rules and regulations are highly essential to the successful management of a sanitarium. It cannot be presumed that unreasonable rules will be adopted or that arbitrary authority will be exercised in any respect. The agreement expressly provides that all rules to govern the institution shall operate uniformly upon the patients of both parties to the contract. It is to be expected that a sanitarium or hospital maintained for the care and treatment of persons affected with tuberculosis would require a different kind of skill in administering treatment, in superintendence, and management than would be required by a county institution for the care of persons suffering from ordinary ailments.

[9] Since the execution of the agreement before us a charter amendment was adopted by the voters of the City and County of San Francisco, authorizing the City to "provide by contract for the maintenance and care of such tubercular patients in hospitals outside the limits of the City and County owned, operated or maintained by other cities, counties, or cities and counties, or may by contract with other cities, counties or cities and counties provide for the joint ownership, operation, maintenance and control of a hospital or hospitals for the treatment of persons suffering from tuberculosis." The amendment above referred to was adopted by the voters of said City and County November 7, 1922, and approved by the legislature in January, 1923. The board of supervisors of the City has since ratified the contract, and thus has exercised the power conferred upon the City by the charter. The contract is thus clearly within the power thus conferred and we need look no further although it is contended that the general powers of the City with reference to hospitals was sufficient authority to justify the contract without the amendment to the charter.

The objection made by the auditor that he will not be

able to indorse upon said contract his certification that there remains unexpended and unapplied a balance of the appropriation of funds applicable to said contract sufficient to pay the estimated expenses of executing the same, as required by section 10, article III, chapter 1, of the City's charter, is not a question now before us for decision. No estimate has yet been made of the cost of the construction of said units inasmuch as the contemplated project has not progressed to that stage. The plans and specifications, when prepared, will furnish the City with the necessary information, to wit, the amount necessary to be set aside for the construction of said units. It may be great or small. Possibly the parties will be unable to agree upon the amount and such a contingency as this is provided for by the tentative agreement.

Upon a full consideration of the questions presented we are of the opinion that the writ of *mandamus* should issue commanding said auditor to approve and allow said demand for the sum of $5,000, to be used for the purpose described in the petition.

The writ will accordingly issue.

Myers, J., Lawlor, J., Lennon, J., Kerrigan, J., Waste, J., and Wilbur, C. J., concurred.