No. 13,297.

ISRAEL *v.* WOOD.
(27 P. [2d] 1024)

Decided November 6, 1933. Rehearing denied December 18, 1933.

Mr. CARL J. SIGFRID, for plaintiff in error.

Messrs. MOYNIHAN, HUGHES & KNOUS, for defendant in error.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

AT an election held on November 8, 1932, Harve E. Israel and Jess M. Wood were rival candidates for the office of sheriff of Ouray county. The canvassing board held that Wood was elected by a plurality of two votes. Israel thereupon commenced a contest proceeding in the county court. The court found that the contestee, Wood, was elected by a plurality of one vote, and rendered judgment accordingly. We are asked to reverse that judgment.

Five votes were cast in precinct number 2 by persons who were inmates of, and were kept at public expense at the county poorhouse of Ouray county. The votes were for the contestee and the court credited them to him. The contestor claims that those votes should have been rejected.

Section 4 of article 7 of the state Constitution provides: "For the purpose of voting * * * no person shall be deemed to have gained a residence by reason of his presence, or lost it by reason of his absence, * * * while kept at public expense in any poorhouse * * *." That provision occurs also in section 7528, Compiled Laws. If, just prior to their becoming inmates of the poorhouse, the voters had a bona fide residence in the precinct in which the poorhouse is situated, they did not lose their residence in that precinct by becoming inmates of the poorhouse. But their presence in the institution

as public charges raised a presumption against their right to vote in the precinct in which it is situated, and it requires evidence to overcome that presumption. *Merrill v. Shearston,* 73 Colo. 230, 214 Pac. 540; *Kemp v. Heebner,* 77 Colo. 177, 234 Pac. 1068. No such evidence was offered.

 Counsel for the contestee say that there is no evidence showing in what precinct the poorhouse is situated. The county court took judicial notice of the fact that the poorhouse is in precinct number 2. Ouray county is one of the smallest counties in the state, and its population in 1930, according to the census, was only 1,784. Colorado Year Book for 1932, p. 18. According to the evidence, the poorhouse is about five miles north of the county seat. It is a public institution, established by the county commissioners under statutory authority and maintained at public expense. C. L. sections 8915 to 8919, both inclusive. The election precincts, also, are established by the county commissioners under statutory authority. C. L. §7705. Courts take judicial notice of matters of common knowledge in the community where they sit. *Antlers Athletic Ass'n v. Hartung,* 85 Colo. 125, 274 Pac. 831; *National Optical Co. v. United States Fidelity and Guaranty Co.,* 77 Colo. 130, 235 Pac. 343. In the latter case we took judicial notice of the relative positions of number 1522 Glenarm place and the corner of Seventeenth and Champa streets in Denver. We have held that courts may take judicial notice of the following matters: The location of a city in a county, *Gould v. Mathes,* 55 Colo. 384, 135 Pac. 780; the existence and location of railroads within the jurisdiction of the court, *Stuart v. Colorado Eastern Railroad Co.,* 61 Colo. 58, 156 Pac. 152; the distance by railroad between Denver and Hot Sulphur Springs, *Osborn v. People,* 83 Colo. 4, 262 Pac. 892. It has been held by the Court of Appeals that the court will take judicial notice of the location of the counties, cities, and towns of the state, and that particular places are in the same judicial district and are con-

nected by railroads. *Gibson v. Austin,* 23 Colo. App. 220, 128 Pac. 859. In re *City & County of San Francisco v. Boyle,* 191 Cal. 172, 215 Pac. 549, it was held that the Supreme Court may take judicial notice of the geographical positions of the San Francisco General Hospital and the Arroyo Sanatorium, near Livermore, in Alameda county, with reference to their proximity to the sea, the influence of ocean winds on their climate, and the density of the population of each, as bearing on their respective merits as places for the treatment of tuberculosis patients. In *McCoy v. World's Columbian Exposition,* 186 Ill. 356, 57 N. E. 1043, judicial notice was taken of the location of the exposition.

The locations of the county poorhouse and election precinct number 2 must have been matters of common knowledge in the county; hence the county court was justified in taking judicial notice of their locations.

■ The county court found that the five men were registered as voters in precinct number 2 at the time of the general election in 1932, and voted there. It also found, but without any evidence to support the finding, that at the general election in 1930 they voted in the Portland precinct, which now, it appears, is merged in precinct number 2. The court rejected one of the five votes. As to the other four, it held that as the voters voted in the Portland precinct in 1930 and in precinct number 2 in 1932, they must have been registered as voters in those precincts; that as there is a presumption that the election officers regularly performed their duty, it must be assumed that in 1932 the four voters had their residence in precinct number 2, within the meaning of the election laws. But it appears that one of the four was admitted to the poorhouse in 1928; two others, in 1929; and one, on September 19, 1930. The presumption is that they were not only not entitled to vote in that precinct while they were inmates of the poorhouse, but that during that time they were not entitled to register there. *Gray v. Huntley,* 77 Colo. 478, 480, 238 Pac. 53. There

is no evidence that they had their residence in precinct number 2 just prior to their becoming inmates of the poorhouse; hence there is no evidence to overcome the presumption that they were not entitled to register and vote in that precinct.

Deducting the four votes from the number credited to the contestee, gives the contestor a plurality of three votes. The contestor, therefore, according to the record before us, was elected sheriff of Ouray county.

There are other votes counted for the contestee that the contestor claims should have been rejected; but it is unnecessary to consider the objections to those votes, for a rejection of the votes would merely increase the contestor's plurality, while counting the votes for the contestee could not give him a plurality.

The judgment is reversed, and the cause is remanded for evidence and a finding concerning the last place of residence prior to their becoming inmates of the poorhouse of those inmates who voted in precinct number 2.

MR. JUSTICE BOUCK dissents.

MR. JUSTICE BOUCK, dissenting.

From the judgment of reversal in this election contest, which involves the office of sheriff of Ouray county, I dissent.

1. By that judgment this court denies the contestee Wood, defendant in error here, the benefit of certain well-recognized and universally accepted presumptions to which he, as the holder of a regular certificate of election, is entitled; for there is here no suspicion or suggestion of fraud. Among these presumptions are: (1) The one in favor of the regularity and honesty of conduct on the part of each of the registration, election, and canvassing officers, including registration of the voters, receiving and counting of the ballots, and issuance of a certificate of election to the contestee; (2) the one in favor of the regularity and legality of the election and

the result certified; (3) the one in favor of the regularity and legality of the votes cast and the qualifications of those who cast them; and (4) the one constituting prima facie proof that voters have a legal voting residence in the precincts where they respectively vote. *Burbank v. Com'rs,* 70 Colo. 302, 201 Pac. 43; *Kay v. Strobeck,* 81 Colo. 144, 149, 254 Pac. 150, 152; 20 C. J., pages 238, 239, 240, §§322, 323, 324; 9 R. C. L. 1162, §152; McCrary, Elections, pages 339, 342, §§459, 466a; 1 Jones, Commentaries on Ev. (2d Ed. by Henderson), page 238, §146; 2 Nichols, Applied Ev., pages 1882, 1883, 1884, 1887, §§8, 11, 13, 26; Hammon on Ev., page 96 [§26b].

2. The burden of proof was on the contestor. See *Price v. Archuleta,* 17 Colo. 288, 29 Pac. 460, and authorities supra. He did not sustain it. His persistent efforts to elicit from the witnesses evidence favorable to himself were futile. It is admitted that, among the persons who cast their ballots for the contestee, five were inmates of the county poorhouse. The rejection of these votes, which the contestor claims are illegal, would leave a bare majority in his favor. However, there is in the record nothing upon which a legitimate argument for such a result can be based. I shall endeavor to show presently that in attempting to make such an argument the majority opinion is not supported by the authorities it cites. The evidence was so overwhelming in sustaining the contestee that the lower court could not have found for the contestor except by invoking, as the majority opinion has invoked, the supposed doctrine of two Colorado cases (*Merrill v. Shearston,* 73 Colo. 230, 214 Pac. 540; *Kemp v. Heebner,* 77 Colo. 177, 234 Pac. 1068), which the majority opinion obviously considers decisive of this case. In this, I think, it is in error.

3. Before analyzing the two cases just mentioned, I shall discuss the Colorado constitutional provision, article VII, §4, referred to therein. It reads: "For the purpose of voting * * * no person shall be deemed to have gained a residence by reason of his presence, or

lost it by reason of his absence, * * * while kept at public expense in any poorhouse or other asylum * * *." The expression "shall be deemed" has been held to be equivalent to "shall be presumed." *Cooper v. Slaughter,* 175 Ala. 211, 222, 57 So. 477, 481; *McCluskey v. Hunter,* 33 Ariz. 513, 520, 266 Pac. 18, 21. "Deem" is sometimes defined as "consider" or "judge," or the like. Whatever meaning is given, the constitutional provision forbids us to take the admitted fact (of being kept at public expense in the poorhouse) as the equivalent—either presumptively or conclusively—of the unknown fact (as to gaining or losing a voting residence). According to my understanding of the majority opinion, this is exactly what has been done. In other words, the Constitution is not merely overlooked; it is nullified.

4. In *Merrill v. Shearston,* 73 Colo. 230, 214 Pac. 540, there were involved certain votes cast by inmates of the Fitzsimons General Hospital, which of course differs widely from a poorhouse. The question in that case was not at all as to whether any voter retained an old voting residence; it was simply whether the proved and admitted *change of residence* involved in the entrance of a voter into a *government hospital* like Fitzsimons had *gained a new residence* which would support a legal vote. Mr. Justice Teller there said (p. 234): "Regardless of this constitutional provision [Art. VII, §4 aforesaid], the patients in this hospital are not, under the statute * * * entitled to vote. * * * Presence in the hospital, *under the circumstances shown,* does not, under the decisions of this court, constitute residence such as is required by the statute." The opinion properly emphasizes, throughout, the vital point that the *acquisition* or *gaining* of a voting residence by voters from outside of the precinct was being considered, and considered upon evidence furnished *by the contestor* as to such acquisition. "Inmates of soldiers' homes," says Mr. Justice Teller, "are generally entitled to stay there indefinitely, and there would be much more reason for holding that they *might acquire*

a voting residence, at such home, than there would be in the instant case, as to the patients. [p. 232] * * * it was held that * * * inmates [of soldiers' homes in New York and Michigan] did not, by residing in such home, *acquire* a domicile, and a right to vote in that district [top of p. 233]. * * * Under the authorities, an inmate of an asylum, or a student attending school, is not, by this constitutional provision, prevented from becoming a voter in the place where the school or asylum is situated. The holding is solely that the right to vote is not *gained* by a *mere residence* at the place; * * *'' (bottom of page 233).

The decision in *Merrill v. Shearston, supra,* must, in justice to this court, be limited to the facts then before us; and the opinion should, in justice to the writer of it, be read in the light of those facts. We cannot properly apply this language in its apparent universality to other institutions in view of the language itself: ''From the undisputed evidence it appears that whatever might be the patient's intention or desire, *he could not make the hospital a place of permanent residence* * * *'' (p. 236). ''When it had been shown that these votes were cast by *patients* in the hospital, there was a presumption against the right to vote that required evidence to overcome'' (Id.). ''We agree with the trial court who said: 'A simple statement of the circumstances of the case, as to this hospital or any other hospital, but especially to this hospital, makes it evident that they cannot contemplate making it a home. * * * it is very different * * * from a soldiers' home, that has the idea of home and permanence in it. This has the idea only of temporary and indefinite occupancy. More than that, in this case *the contestant has shown* that these persons who go there as patients are absolutely under the control of the government officials. They can be excluded from the hospital at any time * * *. *It has been shown* [by the contestor]. Now, under those circumstances, they cannot contemplate * * * any permanent residence or abode in that institution' '' (p. 237). Mr. Justice Teller's general statement,

if strictly interpreted, would indeed be irreconcilable with the actual disposition made by the trial court in that case, approved and affirmed by this court when allowing the votes of certain of the patients to be actually counted in spite of the absolute form of the statement.

It is thus clear that the decision was based wholly upon the nature of Fitzsimons General Hospital. The dictum in the last paragraph on page 236 as to a special presumption (which was neither invoked nor acted upon, inasmuch as the contestor Shearston voluntarily assumed the burden of proof) must be limited to that situation. It could not logically be applied to any dissimilar institution.

That the reasoning is not applicable to "absent student" cases is readily apparent. True, an excerpt from *Welsh v. Shumway*, 232 Ill. 54, 88, 83 N. E. 549, has led to similar difficulties of interpretation, and is quoted in the Merrill-Shearston case. But that excerpt simply says: "A student in a college town is presumed not to have the right to vote. *If he attempts to vote* the burden is upon him to prove his residence at that place * * *." It does not deny a candidate for office, *after the vote is cast by the student*, the benefit of the presumption accorded by that state in the following language more than half a century ago, pursuant to the universal rule discussed at the beginning of this dissenting opinion: "The presumption of the legality of a vote in no way depends upon the omission to challenge or object to it, or any presumed knowledge of the judges of election, but it arises from the fact of the deposition of the ballot in the ballot box. A vote so deposited is presumed to be a legal vote, until there is evidence to the contrary." *Clark v. Robinson*, 88 Ill. 498, 504.

Likewise I submit that it is not accurate to say that an inmate of a poorhouse has no vote, or has a vote only at the voting residence he had in some other precinct before becoming an inmate. He may well have had his last voting residence within the poorhouse precinct itself.

At any rate, the same presumptions of regularity apply. And if the inmate sees fit to claim his voting residence *at the poorhouse,* I can conceive of no good reason why he could not legally do so. ''Since, however, the question of intention is important, according to the weight of authority when a person voluntarily abandons his residence and becomes an inmate of a public or charitable institution with the intention of making it his permanent residence, he becomes a qualified voter in the precinct wherein such institution is located after the required period of residence, notwithstanding a constitutional provision of the nature already stated * * *.'' 20 C. J. 73, §31. The only exceptions there cited to the contrary (note 7) are *Powell v. Spackman,* 7 Ida. 692, 65 Pac. 503, and *Wolcott v. Holcomb,* 97 Mich. 361, 56 N. W. 837, which will be referred to below.

Perhaps the ablest discussion of the meaning and limitations of a constitutional provision like our section 4 of article VII, here involved, appears in the opinion speaking for a unanimous supreme court of seven members in *Cory v. Spencer,* 67 Kan. 648, 73 Pac. 920, a ''soldiers' home'' case. Not only does it expressly overrule the case of *Lawrence v. Leidigh,* 58 Kan. 594, 50 Pac. 600, which was mentioned by Mr. Justice Teller; but it discusses with keen discrimination certain cases decided in New York, Michigan, and Idaho, namely *Silvey v. Lindsay,* 107 N. Y. 55, 13 N. E. 444, and *Wolcott v. Holcomb,* supra (both cited by Mr. Justice Teller), and *Powell v. Spackman,* 7 Ida. 692, 65 Pac. 503. The Cory-Spencer opinion seems so persuasive, and so in accord with recognized modern principles of law, that it may well be deemed decisive of the case at bar in favor of the contestee.

5. Of the case of *Kemp v. Heebner,* 77 Colo. 177, 234 Pac. 1068, little need be said. Much of what has been stated in relation to the Merrill-Shearston case applies to the Kemp-Heebner case. The logical basis of the latter, in the view of this court as shown by the opinion, is

510

indicated by the following quotations from it as to the holdings in the former case: "Patients and inmates [of Fitzsimons], as well as civilian employees, are not permitted as of right to remain at the hospital. [p. 179] * * * the inmates of *such an institution* are not, on account of their mere residence, entitled to vote at a general election [p. 180]. * * * presence in *such* a hospital or asylum *in the circumstances* does not constitute a residence such as is required to qualify them as voters [Id.]. * * * the presumption is against the right of inmates of *such a government hospital* to vote" (Id.). Moreover, Mr. Justice Campbell specifically limits the doctrine thus: "The residence of neither class in *such a hospital* under the decision in the Merrill case constitutes a residence or domicile such as is required concerning the qualifications of voters" (p. 180). In the Kemp-Heebner case, as in the Merrill-Shearston case, the contestor voluntarily assumed the burden of adducing evidence to overcome the usual presumptions. Under the record in each case, no special presumption was invoked or applied; and of course, since it was not involved, any dictum concerning such a special presumption could not properly be considered a part of the decision, or be held to dispense with the general presumptions of regularity discussed at the outset in this opinion.

6. It is my conviction that on the ground of both reason and authority, as above shown, the majority opinion errs when it says (p. 503): "The presumption is that they [the voters whose votes are here questioned] were not only not entitled to vote in that precinct [wherein the poorhouse is situated] while they were inmates of the poorhouse, but that during that time they were not entitled to register there." Whether the former voting residence was in or outside of the poorhouse precinct, or whether they were registered in that precinct after admittance to the poorhouse, is manifestly immaterial and irrelevant. Compare in addition to authorities already cited: *Goben v. Murrell,* 195 Mo. App. 104, 190 S. W. 986;

*Sisk v. Gardiner,* 25 Ky. L. 18, 74 S. W. 686. *Black v. Pate,* 136 Ala. 601, 34 So. 844.

7. In connection with my discussion of the Merrill-Shearston case (No. 10,578) and the Kemp-Heebner case (No. 11,164) I hereby refer to the original transcripts of record and the briefs therein, on file in this court, and to Sup. Ct. Lib. Abstr. and Briefs, vols. 884 and 955, respectively. Incidentally, the italics used in the various quotations herein are mine.

8. ''The law encourages all legal voters to exercise their right to vote, and in cases of doubt as to a voter's residence it is resolved in favor of permanency of residence in the precinct where he casts his ballot.'' *Kay v. Strobeck,* 81 Colo. 144, 149, 254 Pac. 150, 152.

The judgment in favor of the contestee, as I believe, ought to be affirmed. Even if there had been prejudicial error requiring a reversal, the judgment ought not to limit the court below, as it does (p. 504), to ascertaining and determining ''the last place of residence prior to their becoming inmates of the poorhouse of those inmates who voted in precinct No. 2 [the poorhouse precinct],'' and it ought not to impose upon the lower court, as it does, a specific presumption created by a mere dictum in a dissimilar case to stand in lieu of the time-honored presumption dwelt upon at the very beginning. For the reasons above given, I respectfully dissent.