[S. F. No. 16406.   In Bank.—May 28, 1940.]

THE CITY OF OAKLAND (a Municipal Corporation), Petitioner, v. HARRY G. WILLIAMS, as City Auditor, etc., Respondent.

F. Bert Fernhoff, City Attorney, and Homer W. Buckley, Assistant City Attorney, for Petitioner.

Fred Hutchison, City Attorney (Berkeley); H. Albert George, City Attorney (Alameda), Joseph J. Yovino Young, City Attorney (Albany), George Lacoste, City Attorney (Emeryville), Girard Richardson, City Attorney (Piedmont), Thomas Carlson, City Attorney (Richmond), Charles A. Beardsley, Port Attorney, and W. Reginald Jones, Assistant Port Attorney, as *Amici Curiae,* on Behalf of Petitioner.

Markell C. Baers, Clarence De Lancey and Melville C. McDonough for Respondent.

SHENK, J.—This is an application for a peremptory writ of mandate directing Harry G. Williams, as auditor of the City of Oakland, to countersign and endorse his certificate upon a certain contract for and on behalf of said city, as required by sections 125 and 131 of its charter. The proceed-

ing comes before us on an agreed statement of facts pursuant to the provisions of sections 1138–1140, inclusive, of the Code of Civil Procedure. Briefly, the parties hereto seek an adjudication of the validity of said contract and of the contemplated expenditure thereunder of some $60,000 for an extended survey of the sewage disposal problem of the signatories thereto, some seven municipalities situated on the east side of San Francisco Bay.

It appears that the seven interested municipalities consist of the cities of Oakland, Berkeley, Piedmont, Alameda, Albany and Richmond, operating under freeholders' charters, and Emeryville, a city of the sixth class, organized under the Municipal Corporation Act. These cities are contiguous and presently discharge their sewage by many outlets into San Francisco Bay, several of such outlets being jointly used by two or more cities. By reason of the proximity of these outlets, dispersion has proved highly unsatisfactory, and admittedly a grave condition exists threatening both health and property. Specifically, it is alleged that the prevailing method of sewage disposal of said municipalities has caused the illness of persons required to work in the general vicinity, has resulted in damage to near-by property and ships, and has caused a pollution of shellfish. The State Board of Public Health has by resolution declared the sewage-laden mud flats of the East Bay to be a public nuisance and has urged the several named municipalities to take action looking to the early abatement thereof.

In an effort to overcome and terminate such unhealthful and unsatisfactory condition, each of the named municipalities in 1937 appointed an official to a body known as the East Bay Executives' Association, whose province it was to investigate and find the facts. A sub-committee of the Executives' Association, composed of the city engineers of the several cities, made further studies. These investigations and studies disclosed that the problem could not be satisfactorily solved by independent action of each of the municipalities, but, instead, required a joint survey and investigation of conditions in all the area and of the suitability of different methods of disposal to the peculiar circumstances there existing. It was also reported that such a survey would require approximately seven months and would involve an expenditure of $60,000. Thereupon the seven named municipalities, by appropriate

action of their governing bodies, approved such recommendation and respectively authorized the execution of a proposed agreement among them looking to such joint survey and study and directed the appropriate officers to execute the same on their behalf, each agreeing to pay its share of the expenses incident thereto. Williams, as auditor of the City of Oakland, is required under the charter to countersign and endorse his certificate on any contract to the effect that there remains a balance of funds sufficient to pay the expense of executing it, and no contract is binding without such endorsement. Admittedly, ample funds remain in the Oakland treasury for the performance and discharge of its obligation under the contract here involved, but Williams, as auditor, nevertheless has refused to countersign the contract on the ground generally that the City of Oakland is without authority under its charter to enter into such a contract with its neighboring cities for a joint survey of the sewage disposal problem. In support thereof he advances several reasons which under· the charter assertedly preclude such a contract. They will be stated and disposed of in the order in which they are advanced.

Preliminarily, it is well to state that while it may not be wholly impossible for each of the several named cities to separately solve its sewage disposal problem, yet by reason of their geographical location and the topography of the area, with which this court is quite familiar and of which it may take judicial knowledge, any independent action of one or more of said cities looking to the solution of the problem would, because of the action of the tides and currents of San Francisco Bay, still leave unabated the obnoxious nuisance and health menace resulting from sewage deposited on the common shores by the neighboring cities continuing to discharge their sewage into the bay. This and the further fact that there is a present interlocking or common use of certain sewers and outfalls by the named cities makes it readily apparent that the proposed joint solution of the problem is the only feasible and practical one. Therefore, the Executive Association above mentioned proposed a form of contract, later agreed upon and approved by the governing bodies of the several cities, by which said cities would contract with one of their number to do the work under certain restrictive conditions and subject to the approval and supervision of an executive committee

whose membership would consist of one representative from each of the contracting cities. The City of Berkeley was thought to be best adapted to carry out the work, and accordingly the agreement whose validity is here involved was entered into. By its terms the City of Berkeley will become the sponsor of the proposed survey and the depository of the funds agreed by the several signatories to be paid toward the cost and completion of such survey. All contentions of Williams to the contrary notwithstanding, it may generally be stated that by the terms of the agreement the City of Berkeley is to be the employer of all persons engaged upon the survey. It is to enter into all necessary contracts in its own name and is to disburse all funds from the Sewage Disposal Survey Fund. But, in order to give each of the cities contributing to the fund the right to approve the expenditures and to determine that the agreement is being carried out as intended, the City of Berkeley agrees that none of the money will be disbursed except upon approval of the executive committee, and that it will not enter into any contract or employ any person unless the matter is first approved by the executive committee composed, as hereinbefore stated, of one representative from each of the contracting cities. However, the executive committee itself is without authority to incur any expense, execute any contract or employ any person. The committee's approval is merely a condition precedent to the exercise of the powers conferred by the agreement on the City of Berkeley. All acts and obligations are those of the City of Berkeley. By the adoption of an ordinance providing for the employment by it of all necessary survey employees, the City of Berkeley appears to have given to the agreement a practical construction meriting the consideration and approval of this court. We need not here further detail the many provisions of the contract, but shall refer to them as necessary in the discussion of the many assaults thereon by Williams, as auditor of the City of Oakland.

The statute under which the above contract was drafted was enacted in 1921 (Stats. 1921, p. 542) and is entitled "An act providing for the joint exercise of powers by counties, by municipalities or by municipalities and counties." Section 1 thereof, among other things, provides that two or more municipalities "by agreement entered into respectively by them and authorized by their legislative bodies, may jointly exer-

cise any power or powers common to the several contracting parties." Section 2 of the act designates in general language the nature and contents of such a joint agreement. Section 3 declares that "The parties to such agreement may provide that contributions from the treasuries may be made for the purpose for which the agreement was entered into or payments of public funds shall be made to defray the cost thereof, which funds may be made to and disbursed by such agency as may be agreed upon; provided, however, that the method of disbursement shall agree as far as the same is practicable with the method provided by law for the disbursement by the parties to such agreement." Sections 4 and 5, respectively, provide for the term of such a joint agreement and for the disposition of any property or surplus remaining upon completion of the agreement and accomplishment of its purpose.

In *In re City and County of San Francisco*, 191 Cal. 172 [215 Pac. 549], we had occasion to consider and approve the validity of the cited act and a joint agreement there entered into pursuant to its provisions. The several cities involved in the present proceeding assert that the contract now before us follows both the provisions of the statute and the agreement approved in the cited case. In opposition to the contentions of its auditor the City of Oakland urges, and in that it is joined by the other signatory cities and by the Port of Oakland, who have appeared and filed briefs herein as friends of the court, that the agreement does no violence to any of the provisions of the charter of the City of Oakland, and further, that even if it be assumed that a conflict does exist between the agreement and one or more charter provisions, the latter would have to be held inapplicable for the reason that the subject matter of the contract, sewage disposal as contemplated, is a "state affair" and not a "municipal affair", thus making the provisions of the general law applicable rather than the charter provisions. With this preliminary statement we proceed to a detailed discussion of the objections advanced in his brief by Auditor Williams.

In substance, Williams, as auditor of the City of Oakland, urges that the statute above referred to authorizing the joint exercise by municipalities of powers "common" to them does not contemplate or permit the joint exercise of powers that may be separately or independently exercised by them, but only permits of the joint exercise of powers already pos-

sessed in common. Such a construction of the statute is strained and would render it meaningless. In other words, if municipalities possessed a power in common there would be no need for a statute authorizing their joint exercise. ▇ The statute means nothing if it does not mean that cities may contract in effect to delegate to one of their number the exercise of a power or the performance of an act in behalf of all of them, and which each independently could have exercised or performed. A statute thus authorizing the joint exercise of powers separately possessed by municipalities cannot be said to enlarge upon the charter provisions of said municipalities. It grants no new powers but merely sets up a new procedure for the exercise of existing powers. The cities that are parties to the contract here involved possess the necessary police power, both under constitutional grant and under their respective charters, to abate nuisances, to preserve the health of their inhabitants and to construct and maintain sewers. The 1921 statute merely provides a procedure whereby this power may be exercised by cooperative action. This type of statute is not unusual in this state. In other instances, the legislature has authorized two or more governmental agencies to contract, whereby one is empowered to perform a governmental function for another. (See, among others, Stats. 1895, p. 219, Deering's Gen. Laws, Act 8464; Stats. 1915, p. 329, Deering's Gen. Laws, Act 5616.) In so legislating the legislature recognizes that there are certain situations and problems that can best be met and solved by several governmental agencies acting jointly and permitting one of their number to act for all. As already indicated, this court approved this statute and an agreement thereunder in *In re City and County of San Francisco, supra.*

▇ It is next urged that the Oakland charter contemplates joint action in two particulars not here pertinent and that such specific mention necessarily excludes the assumption that other and unmentioned powers may be jointly exercised. However, we are satisfied that the admitted exception to the cited rule here governs, i. e., where the charter is silent a city may exercise powers conferred upon it by general law, provided such general powers are not inconsistent with those granted by the charter. We find no such inconsistency in this case. ▇ In other words, under sections 6 and 8 of article XI of the State Constitution, city charters are no

longer grants of municipal power but are merely restrictions and limitations upon such powers. ■ If no restrictions or limitations are found in the charter the power of the city in "municipal affairs" is full and complete, assuming for present purposes that sewage disposal generally is a municipal as distinguished from a state affair. We find no restriction or limitation in the Oakland charter precluding joint action with neighboring municipalities in the contemplated plan of sewage disposal, which, because of the proximity of said cities, presents a common problem.

■ Much of what we have just above stated is equally applicable to the contention that the City of Berkeley is without power to authorize the proposed agreement for a joint survey of the sewage problem confronting the East Bay cities. We are aware of no provision of the Berkeley charter, and none has been called to our attention, which restricts and limits that city's right to execute the agreement. From what has been said it follows that it is the City of Berkeley and not the executive committee that is to act under the contract when executed. The committee merely approves any contemplated action by the sponsor, City of Berkeley.

■ The point is made that said contract provides for an unlawful delegation by Oakland of the handling and disposition of a substantial amount of the public tax funds and in the determination of the particular purpose for which they may be expended. In this connection it is urged that an unbridled discretion is vested in the City of Berkeley or the executive committee, or both, as to the type of survey to be carried on, and that it may develop that Oakland tax funds are being expended in studying the tideland flats of the other contracting cities. Obviously, if a joint survey is to be successfully effected some administrative discretion must be conferred upon the sponsor city and the engineers and other necessary employees appointed by it. The City of Oakland, through its council, has itself exercised the function and discretion of determining whether to enter into the contract for a joint survey and of appropriating money to execute it. It cannot be said that the delegation of the administrative function of checking the expenditure of money in accomplishment of the desired purpose infringes upon any constitutional or charter provision.

It is next urged that the joint agreement violates section 18 of article XI of the Constitution, the so-called debt limitation provision, which precludes a city from incurring any indebtedness or liability exceeding in any year the income and revenue provided for such year. It is contended that the constitutional provision is violated in that the contract "provides for the incurrence by the municipalities of obligations which may become due and payable in future years, without a vote of the electorate being had." The point lacks merit. Under the terms of the agreement each of the seven cities is to pay one-half of the amount to be contributed by it on or before February 1, 1940 (in the case of the City of Oakland that amount is $20,000), and the "remaining one-half at such time and in such specified amounts as may be requested . . . to pay for obligations incurred after July 1, 1940." It does not appear, nor can we say, that when and if future payments accrue they will exceed in any one year the income and revenue provided for such year. In the absence of some showing on the subject, it will not be presumed that a violation of the constitutional provision will result (*In re City and County of San Francisco*, 191 Cal. 172, 181 [215 Pac. 549]). It is there declared that "Whether the city will be able to meet the payment of an undetermined sum . . . to fall due on a day *in futuro* is a question prematurely presented and cannot be decided in this controversy . . . but in no event would we be justified in presuming, in the absence of a showing to the contrary, that the city would not be amply prepared to meet its future obligations or that it will not keep within the law in respect to charter and constitutional restrictions." In *Wyckoff* v. *Force*, 61 Cal. App. 246 [214 Pac. 489], it is stated that "It does not appear that any installment coming due in any year during the life of the contract was in excess of the income and revenue of that year. The contract is not, therefore, within the inhibitions of section 18 of article XI of the Constitution." To the same effect see *McBean* v. *City of Fresno*, 112 Cal. 159 [44 Pac. 358, 53 Am. St. Rep. 191, 31 L. R. A. 794], and *Posz* v. *Taylor*, 61 Cal. App. 523 [215 Pac. 107]. Moreover, future payments under the contract may or may not be required, depending upon the ultimate cost of the proposed survey. It is not inconceivable that the initial installment may prove adequate. It has been held that "a sum payable upon a contingency is

552

not a debt, or does not become a debt until the contingency has happened". (*McBean* v. *City of Fresno, supra,* 168.)

■ An assault is made upon the contract based on the declaration that it would permit the expenditure of Oakland tax funds for non-municipal purposes in that a portion of said funds may assertedly be expended outside the territorial limits of Oakland and for the purpose of surveying the tidelands of one or more of the other contracting cities. It is hinted that such result would likewise run counter to the constitutional inhibition against the gift of public funds. We cannot approve the contention. Nor are we prepared to join in the assumption or fear that those empowered under the contract may abuse their authority. Among other things, the city in reply to this contention advances its alternative argument mentioned at the beginning of this opinion to the effect that sewage disposal technically presents more than a municipal problem and is of statewide interest. It is urged that cities daily expend their funds in a legal manner in the enforcement of various state laws which in the strict sense of the word do not involve municipal purposes but, on the contrary, involve public purposes or state affairs. ■ Be that as it may, we are satisfied that if in the solution of their respective municipal sewage problems it becomes necessary, as here, for several contiguous cities to contribute to the conduct of a joint survey of the entire affected area, the expenditure of the funds of each such city in this manner is a proper municipal expenditure.

■ We are likewise constrained to reject the argument that the joint survey agreement does violence to the civil service provisions of the charter of the City of Oakland. This contention is in effect premised upon the theory that the City of Berkeley is not, under the agreement, to carry out the survey and that the persons to be engaged in the project must therefore necessarily be employees of the City of Oakland and subject to its civil service requirements. Earlier in this opinion we rejected this theory, pointing out that the City of Berkeley under the agreement was to be the sponsor of the survey and was to enter into all necessary contracts and obligations, pay all appropriate expenses out of the sewage disposal fund and employ all persons essential to the project, subject only to the approval of the executive committee.

This being so, the civil service provisions of the City of Oakland are without relevancy for, obviously, such provisions can have no application to the employees of those who contract with the City of Oakland. In view of what has been said, we need only mention, without considering, the city's additional argument, that if, as it contends, the sewage disposal problem presents a state affair and not strictly a municipal affair, the city charter provisions under established principles are likewise inapplicable.

In principle, the disposition made of the last point is equally applicable to the contention which asserts that the joint survey agreement runs counter to section 38 of the Oakland charter prohibiting the city from employing any person "holding any office or position of profit under the government of this state, or any other state of the United States, or of any nation, government or country". As stated just above, under the agreement, persons engaged in the survey will be employees of the sponsor city, Berkeley. Consequently, a charter provision of the City of Oakland which precludes its employees from holding dual public positions can have no application. Moreover, even if the relevancy of the charter provision were to be admitted, it may not now be said that dual employment will necessarily result under the agreement.

The contention is made that the joint survey agreement does violence to section 125 and other sections of the Oakland charter calling for competitive bids on public work contracts. We cannot accede to the application of said charter provisions under an agreement such as we have here, in which one of the several contracting cities undertakes to carry on the survey. If the conceivably conflicting charter provisions of all the contracting cities were held to be applicable and relevant, the effect would be to vitiate the statute authorizing joint and cooperative action. In other words, there could only be joint action under such a theory when the charter provisions of all contracting cities are identical. To state the matter is to reveal its absurdity.

Section 128½ of the Oakland charter, requiring the payment of minimum wages and the employment only of citizens on public work, is advanced as another obstacle to the joint survey agreement. We are satisfied from a reading of the section that the city is correct in its answering assertion that it

"applies only to a 'contract for work' which is let pursuant to a 'resolution calling for bids' for such work".

It is also urged that the agreement violates those provisions of the Oakland charter relative to the powers of the Oakland Port Commission. The argument is that while the agreement and survey concern in part of the territory of the Port of Oakland, the commissioners of said port have not been consulted with respect thereto. The obvious answer of the city is that when the time arrives to lay plans to construct a new sewer as a result of the survey, "the Port Commission will be consulted, their jurisdiction will be duly honored and their consent obtained".

What we have said adequately disposes of the points urged by Auditor Williams in support of his refusal to countersign the agreement. We do not find it necessary to further consider his general discussion as to the lack of necessity for such joint agreement and as to the asserted dangerous precedent that will follow from an approval thereof.

Let a peremptory writ of mandate issue directing Harry G. Williams, as auditor of the City of Oakland, to countersign the agreement and to endorse thereon his certificate, as required by sections 125 and 131 of the city charter.

Carter, J., Curtis, J., Gibson, J., and Spence, J., *pro tem.*, concurred.